# Alzuma L. Maher v. Title Guarantee & Trust Co., Adm., et al.

1. FREEHOLD—*Where it is Not Involved.*—A freehold is never involved, within the meaning of the statute, except where the primary object of the suit is the recovery of a freehold estate, the title of which is directly put in issue, and where the judgment or decree will result in one gaining and the other losing such estate.

2. SAME—*Where it is Involved.*—A freehold is involved in all cases where the necessary result of the judgment or decree is that one party gains and the other loses a freehold estate; but it is equally clear that a freehold is involved, within the meaning of the constitution and statute, when the title to it is so put in issue by the pleadings that the decision of the case necessarily involves a decision of such issue, although the judgment or decree does not result in one party gaining and the other losing the estate.

3. CHANCERY PRACTICE—*When the Findings of the Chancellor Are Not to be Disturbed.*—Where the various matters of fact found by the decree of the chancellor can not be said to be clearly and manifestly against the evidence, a court of review will not disturb such findings.

4. SAME—*" Colorable Jurisdiction" Will Justify a Decree.*—The entry of an appearance by the defendant in a suit for divorce, although procured by fraud and duress, is sufficient to give the " colorable jurisdiction " of the person of such defendant. and the subsequent proceedings of the court will not be void simply because they are erroneous.

5. SAME—*Equity Will Not Interfere for Mere Errors in Procedure.*— Equity will never interfere with a judgment for mere errors in procedure or by reason of irregularities occurring in the exercise of lawful jurisdiction.

6. SAME—*Attacking Decrees of Divorce Obtained by Fraud.*—Judgments or decrees obtained by fraud may, as a general rule, be attacked in a court of equity and vacated, and the weight of authority is that this rule applies to decrees of divorce, though the courts are very reluctant to disturb such decrees and proceed with greater caution, especially where there has been a second marriage and the rights of innocent persons have intervened.

7. DIVORCE—*Fraudulent Decrees—Laches, When a Bar to Relief.*— The fact that one of the divorced parties has, in the meantime, married an innocent third person, will not deprive the court of its power to vacate the decree; but if there has been unreasonable delay in seeking its vacation, such delay is sufficient to bar the relief, however fraudulent the decree may have been.

8. SAME—*Vacation of Decrees of, Obtained by Fraud.*—Decrees of divorce may, when obtained by fraud, be vacated in the same manner and under the same circumstances which warrant the vacation of other

decrees, although the party who obtained the fraudulent decree had contracted another marriage. Public policy requires that the courts may protect themselves by vacating decrees obtained by fraud, although the rights of innocent parties may sometimes be sacrificed. It is, however, a power which is to be exercised with great discretion, and only upon thorough investigation of the facts.

9. ESTOPPEL—*To Question a Decree—Laches.*—Where a wife against whom a fraudulent decree of divorce is obtained by her husband with her knowledge and acquiescence, delays for an unreasonable time to have the decree vacated, and until the husband has consummated a second marriage with an innocent third person, every principle of estoppel and laches will be applied to protect the rights of innocent parties.

10. EQUITY—*Rule of, Where One of Two Parties Must Suffer.*— Where one of two innocent parties must suffer from fraud, the one who placed it in the power of the defrauding person to commit the fraud must suffer; the equity of the more innocent party must prevail over that of the party through whose fault the fraud became possible.

11. WITNESSES—*Competency of a Divorced Wife of a Deceased Husband.*—Where the divorced wife of a deceased husband files a bill in equity for the purpose of vacating the decree and proceedings in the suit wherein she was divorced from such deceased husband, and makes his widow by a subsequent marriage and his administrator parties defendant to the suit, and they defend as such, such divorced wife is not competent as a witness under section two of the statute of evidence and depositions.

12. PRACTICE—*Entry of Appearance Must be in Apt Time to Justify a Default.*—Where an instrument authorizes an attorney to enter the appearance of a defendant and consent that a default may be entered in the cause, and the attorney merely enters the appearance and waives service of process, but does not consent to the entry of the default, the effect is to place the defendant in the same position as if served with process in due course of law, and a default taken where such appearance has not been entered, at least for the same period of time before the first day of the term as is required in cases of personal service of process, is erroneous, but a decree entered upon such default is not a nullity.

**Bill of Review.**—Appeal from the Superior Court of Cook County; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in this court at the October term, 1900. Affirmed. Mr. Justice SEARS dissenting. Opinion filed June 10, 1901.

**Statement by the Court.**—Appellant filed her bill in the nature of a bill of review in the Superior Court of Cook County, January 23, 1896, against Mark H. Maher, and subsequently on March 30, 1896, filed an amended bill, both seeking to set aside as fraudulent and void a certain

decree of divorce theretofore rendered by said court on the 27th day of February, 1895, in the suit of Mark H. Maher against appellant.   After filing the original bill said Mark H. Maher died intestate on February 1, 1896, and the appellee, the Title, Guarantee & Trust Company, was appointed administrator of his estate.   He left certain heirs at law, whose names are set out in the amended bill and are made parties thereto with said Trust Company and the appellee Elizabeth Bodle Maher, sued by the name of Elizabeth Bodle.

After said decree of divorce and on the 21st day of December, 1895, said Mark H. Maher was married to the appellee Elizabeth Bodle, and lived with her as his wife up to the time of his death.

Answers were filed by the Trust Company and Elizabeth Bodle Maher, and replications thereto, and thereafter the cause was heard upon evidence, oral and documentary, taken and offered in open court.   Thereafter, when the evidence had all been heard, the amended bill was further amended, as were also the answers of the appellees.

After the pleadings had been amended and on July 21, 1900, the court entered a decree, which, after reciting the pleadings as aforesaid, the appearance of counsel and hearing of evidence in open court, finds and decrees in substance as follows :

That the bill of complaint as amended herein is an original bill in the nature of a bill of review; that it was properly filed and states a good case.   That Mark H. Maher in his lifetime was lawfully married to Alzuma L. Maher on the 27th day of June, 1892, and that on the 24th day of January, 1895, he filed his bill against said Alzuma in the Superior Court of Cook County, praying for a divorce, and in said bill charged the said Alzuma L. Maher, his wife, with extreme and repeated cruelty.   That on the 26th day of January, 1895, one Francis A. Riddle, an attorney of this court, entered in writing the appearance of said Alzuma L. Maher, as defendant in said divorce suit, and filed with said written entry of appearance the following paper, signed

by said Alzuma L. Maher, and upon which said entry of appearance was written, viz.:

"In the Superior Court—Mark H. Maher v. Alzuma L. Maher—I hereby authorize Francis A. Riddle to enter my appearance as defendant herein, and consent that default may be entered against me in this cause. Alzuma L. Maher."

That said bill was addressed to the February term, 1895, of the Superior Court of Cook County, which convened on the first Monday of February, to wit, the 4th day of February, 1895. That said appearance or authority of said Francis A. Riddle, as complainant's solicitor, was procured by the said Mark H. Maher through coercion, fraud and duress. That the said Alzuma L. Maher was not guilty of extreme and repeated cruelty as in said bill for divorce alleged. That shortly after the entry of said decree for divorce, the said Mark H. Maher and Alzuma L. Maher continued to live and cohabit together as husband and wife at Downer's Grove, twenty-five miles from the city of Chicago, for two days in the week for a period of nine months after said decree of divorce was granted. That said decree of divorce was obtained by the said Mark H. Maher by means of false and perjured testimony. That the complainant knew of the divorce proceedings, and that she knew that she had signed the entry of appearance; that suit had been brought, and that the case had been heard by Judge Brentano, and that it was heard before Judge Payne; that she knew that she was notified of the hearing before Judge Payne, and knew of the decree having been entered, yet in all the different steps in the original divorce proceedings Alzuma L. Maher was an unwilling party, and that she did whatever she did under the influence and threats that had been exerted over her by her husband, said Mark H. Maher, and those surrounding her. That the allegations in the bill of complaint that a great wrong and fraud had been perpetrated upon Alzuma L. Maher from the beginning to the end of that divorce proceeding, were sustained by the evidence, and that the decree which was entered was

Maher v. Title Guarantee & Trust Co.

procured by the fraud and conspiracy alleged in complainant's bill. That a default was entered in said original divorce suit against the said Alzuma L. Maher, on said written appearance, on the 26th day of January, 1895, and that at said time the court had colorable jurisdiction of the person of said Alzuma L. Maher by reason of said written appearance. That at the time of the entering of said decree for divorce, namely, on the 27th day of February, 1895, the court had jurisdiction of the subject-matter and colorable jurisdiction of the person of said Alzuma L. Maher, by reason of said written appearance aforesaid, and by reason of said default. That Mark H. Maher married the defendant Elizabeth Bodle Maher on the 21st day of December, 1895, and that said marriage was consummated by the said Elizabeth Bodle on the said 21st day of December, 1895, she relying in good faith upon said decree of divorce, and that said Mark H. Maher departed this life intestate on the 1st day of February, 1896, without issue him surviving, and seized of real estate situated in the county of Cook and State of Illinois. That the Title Guarantee & Trust Company, one of the defendants herein, was made and is administrator of the estate of said Mark H. Maher, deceased. That the complainant herein, Alzuma L. Maher, by her conduct is estopped from recovering herein, and has been guilty of such laches in bringing this suit as bars her right to recover in this cause. It is therefore ordered, adjudged and decreed by the court that said original and amended bills of complaint herein be dismissed.

From this decree the appeal herein is taken, and both errors and cross-errors are assigned.

A. J. Hopkins, Seth F. Crews and Ralph Crews, attorneys for appellant; Geo. W. Brown, of counsel.

James B. Muir and Millard F. Riggle, attorneys for appellees; S. P. Shope, of counsel.

Mr. Justice Windes delivered the opinion of the court. Counsel for appellees raise a preliminary question, viz.,

that a freehold is involved, and therefore that this court is without jurisdiction.

It is said that the necessary effect of the decree · in this case is that a freehold will be lost to the appellee Elizabeth B. Maher, if the decree of divorce of February 27, 1895, should be set aside, and appellant would gain one, and therefore that this court is without jurisdiction. If the facts in the record justify the claim, then the law is with appellees on this point. R. R. Co. v. Watson, 105 Ill. 217; Sanford v. Kane, 127 Ill. 591; Ryan v. Sanford, 133 Ill. 291; Parsons v. Millar, 189 Ill. 107.

It seems that the earlier decisions of the Supreme Court, among which are Chicago, etc., R. R. Co. v. Watson, 105 Ill. 217, have been modified by the later cases. In the Watson case it was said : " A freehold is never involved, within the meaning of the statute, except where the primary object of the suit is the recovery of a freehold estate, the title whereof is directly put in issue," and where the decree will result in one gaining and the other losing such estate.

In the very recent case of Parsons v. Millar, *supra*, the court quotes from Sanford v. Kane, *supra*, as follows :

" A freehold is * * * involved in all cases where the necessary result of the judgment or decree is that one party gains and the other loses a freehold estate; but it is equally clear that a freehold is involved, within the meaning of the constitution and statute, when the title to a freehold is so put in issue by the pleadings that the decision of the case necessarily involves a decision of such issue, although the judgment or decree does not result in one party gaining and the other party losing the estate."

The difficulty, however, with appellees' claim is, that it does not appear by this record that a freehold estate will be either gained or lost as a result of this decree. No issue is made by the pleadings which directly involves a freehold estate, and the record only shows that Mark H. Maher died intestate without issue him surviving, seized of real estate in Cook county, Illinois. What his title thereto was, or whether his heirs at law had any real estate at the time the

decree was entered, fails to appear.    What real estate he had at the time of his death, for all that appears, may have been sold to pay debts or converted into money.    We are therefore of opinion that appellees' contention that a freehold is involved, is not sound.

As to the merits of this case, we will not attempt to follow counsel through the various contentions made by them in their arguments, but will endeavor to decide  the different questions presented  by  the record, in view of  the substance of their contentions as they seem to us.

From  a careful  consideration of  the pleadings and evidence in the case, in the light of the  arguments, we have reached  the  conclusion  that  the  various matters of fact found by the  decree of  the chancellor  are justified  by the evidence; at least it can not be  said  that such findings are clearly and manifestly against the evidence.    When this is so, it is the settled law of this State that a court of review should not  disturb  the  findings of the  chancellor.    This leaves us, then, to consider  only  questions of  law arising upon this record, and. we will not  refer in detail to the evidence, except in so far as may be necessary to a full understanding of the questions of law to be considered.

It is claimed for appellant that the decree of divorce rendered by the Superior Court is void, because the divorce case was heard and the decree therein  entered before the Superior Court convened for the term for which summons in the cause was returnable.    We think this claim is not tenable.

It appears from the findings of the  decree in this case and from the evidence, Maher  filed  his  bill  against appellant  on January 24, 1895; that two days thereafter Francis A. Riddle, an attorney of  that court, entered in  writing the appearance of appellant as defendant in  that case, and filed with  said appearance a  paper signed by  appellant and upon  which the  appearance was  written  as follows :

" IN THE SUPERIOR COURT OF COOK COUNTY.

MARK H. MAHER
        v.         } In Chancery.
ALZUMA L. MAHER.

I hereby authorize Francis A. Riddle to enter my appear-

ance as defendant herein and consent that default may be entered against me in this cause."

That the bill was addressed to the February term, 1895, of that court and that it convened on the 4th day of February following, which was the first day of the term; that said appearance was procured by Mark H. Maher through coercion, fraud and duress; that the default of appellant in the divorce case was entered by virtue of said written appearance; the evidence was thereafter heard and the decree entered on February 27, 1895, which was during the February term of the court; that appellant knew of the divorce proceedings and knew that she had signed the entry of appearance; that suit had been brought and the case heard by Judge Brentano; knew that it was heard by Judge Payne; that she was notified of the hearing before Judge Payne, and knew of the decree of divorce having been entered, and when she received a copy thereof, took from the Illinois Trust and Savings Bank the sum of $1,500, for which she executed her receipt as follows:

"CHICAGO, March 1, 1895.

Received from the Illinois Trust & Savings Bank the sum of fifteen hundred ($1500) dollars in full of any alimony which may be due me from Mark H. Maher.

ALZUMA L. REEVES MAHER."

That at the time she received said money, and before its receipt, upon being asked by the trust officer of the bank, where the money had been deposited by Maher for the purpose of making the payment to her, whether she understood fully the purport of the signing of this receipt, and the acceptance of the $1,500, she said that she did, and that she thought that was the best way to fix it up, or words to that effect.

This being the state of facts shown by the record, the chancellor was clearly justified in finding that the Superior Court had "colorable jurisdiction" of the person of appellant by virtue of said written appearance. That appellant authorized the appearance, and that the attorney, pursuant to the authority, entered the appearance, is not and can not be questioned. That she knew of the progress of the case

Maher v. Title Guarantee & Trust Co.

and the hearing, before the decree was entered, and of the entry of the decree on March 1, 1895, which was during the February, 1895, term of the court, is clearly established.

The decree was not void for lack of jurisdiction of appellant's person, nor because of a want of power in the Superior Court to enter appellant's default and proceed to a hearing and decree at the February, 1895, term of the court. The appearance of appellant served the same purpose as service of summons on her. The proceedings of the court in that regard were at most only erroneous. Town of Lyons v. Cooledge, 89 Ill. 529–34, and cases cited; Millard v. Marmon, 116 Ill. 649–53; Pyle v. Pyle, 158 Ill. 289–94; Van Matre v. Sankey, 148 Ill. 536–53; Fitzpatrick v. Rutter, 58 Ill. App. 532–9; Boston T. House v. Fisher, 59 Ill. App. 400–5; Freeman on Judgments (2d Ed.), Sec. 487.

Mr. Freeman, in the section cited *supra*, says that equity will never interfere with a judgment for mere errors in procedure or by reason of irregularities occurring in the exercise of lawful jurisdiction.

In the Coolidge case, *supra*, it was held that the service of process upon a defendant gave the court jurisdiction of the person, and subsequent proceedings of the court were not void, however erroneous. Judgment was taken, as it seems, without giving the defendant the time allowed by statute to plead to the action, and the court held that this fact did not vitiate the judgment, citing cases, among them Whitwell v. Barbier, 7 Calif. 63, in which judgment was taken against a defendant served with process before the day on which he was allowed by statute to appear and answer, and it was held that the court had jurisdiction of the person, and its judgment was not a nullity.

In the case of Pyle, *supra*, the Supreme Court held that service of summons upon defendants gave the court jurisdiction of their persons, and a decree rendered against them without default or answer was not a nullity—merely error.

In the Fitzpatrick case, *supra*, it was held that a judgment was not void, but simply erroneous, where it was

rendered at a term at which the court had no right to proceed, because the declaration had not been filed ten days, but only nine days, before the commencement of the term, the court having jurisdiction of the subject-matter of the suit and of the person of the defendant by service of process.

No doubt in this case it was error for the Superior Court to take appellant's default and proceed to a hearing and decree at the February term, 1895, unless it can be said that by virtue of her authority to Mr. Riddle she consented that her default be taken. As we construe the authority, it was one which authorized Mr. Riddle to enter her appearance and consent to her default. He did not do all he was authorized to do, but merely entered her appearance and waived service of process on her behalf. This placed her in the same position as if she had been served with process on the 26th day of January, 1895, which was too late to justify her default and a decree at the February term following. The proceeding, however, by the court at the February term, was, in our opinion, simply erroneous and not without jurisdiction, because the entry of the appearance of appellant conferred jurisdiction. No doubt upon appeal or writ of error, the decree might have been reversed for the irregularity in the proceeding, but not because the decree was a nullity.

All of the cases cited by appellant on this point, except that of Windsor v. McVeagh, 93 U. S. 274, are cases where the point was considered upon appeal or writ of error in the particular case, and are not applicable here. The Windsor case is an extreme one in its facts, and apparently turns upon the point that the defendant's answer was stricken from the files and the decree of the court was entered against him without giving him an opportunity to be heard. The case does not present, as here, a mere irregularity in procedure, but a denial of any right to a hearing before the court.

It is contended that the chancellor erred in refusing to permit the appellant to testify in her own behalf, and espe-

Maher v. Title Guarantee & Trust Co.

cially by way of rebuttal as to conversations and transactions testified to by agents of Mark H. Maher during his lifetime.

The Trust Company defends as administrator, and the appellee Bodle as the widow and heir of Mark H. Maher, deceased, as against the bill of appellant, who claims to be the widow and heir of said Maher, deceased.    In the case of Laurence v. Laurence, 164 Ill. 367–72, which was a bill by one claiming to be the lawful widow of an intestate, as against the heirs at law of such intestate, it was held, reviewing numerous previous decisions of the Supreme Court, that the complainant was an incompetent witness under section 2 of our statute as to evidence and depositions.    The court, after holding that where the contest is between persons conceded to be heirs, and the controversy is only as to the distribution of the estate among them, and does not tend to impair or reduce the estate among them, they may testify, but say, " Appellee was not an heir until she established the marriage which she alleged, and which was denied by the heirs; and until such marriage was established by proof or conceded, she was a stranger to the estate and incompetent to testify, and the court erred in permitting her to do so over appellants' (the heirs) objection." This case is conclusive as to the first part of appellant's contention.

The second part of the contention is not tenable, for the reason that appellant's evidence as to any conversations and transactions testified to by agents of deceased was not excluded in so far as her testimony is made competent by the second· exception in section 2 of the statute above referred to, relating to conversations or transactions between an agent and a party in interest.    She was permitted to testify in reference to transactions and conversations related by the witnesses Miss Stewart and Mr. Riddle, and her evidence was excluded only in so far as it would rebut the evidence of the witness Mr. Gemmill, which was as to matters that took place in the presence of deceased.    As to such matters, Gemmill can not be said to have been an

agent of deceased, for he was then not acting for deceased and had not acted for him except as a mere scrivener. (Spencer v. Boardman, 118 Ill. 553-7.) We think that the second exception of the statute refers to conversations or transactions between an agent and the party in interest, and not to transactions and conversations between the deceased and the party in interest in the presence of an agent. What Gemmill testified to was as to conversations and transactions not between him and appellant, but between appellant, her then husband, and his attorney and others, all in the presence of the deceased. These were the conversations as to which appellant's evidence was excluded, and we think, properly. As we construe the case of Ruckman v. Alwood, 71 Ill. 155, relied upon by appellant, it does not hold that she was competent in this respect.

It is claimed by counsel for appellees, in effect, that the evidence in the record is not of that clear and satisfactory nature that it justified the chancellor in finding, as was done, that the divorce was obtained upon false and perjured testimony. We deem it unnecessary to refer in detail to the testimony in this regard. We have examined it carefully and are of opinion that if it did not clearly justify the conclusion of the chancellor, we can not say that his finding in that regard is clearly and manifestly against the evidence.

We will now proceed to consider the principal and remaining question in the case, viz., as to whether the decree dismissing the bill for the reason that appellant is estopped by her conduct, and has been guilty of such laches in bringing her suit as precludes her from any relief.

Numerous cases and authorities bearing upon this question have been cited and relied upon in the arguments by the respective counsel, which are unnecessary to be reviewed in view of the conclusion we have reached.

When judgments or decrees have been obtained by fraud, they may, as a general rule, be attacked in a court of equity and vacated in such a proceeding as the one at bar. This is settled by all the authorities, and the weight of author-

ity is that this rule applies to decrees of divorce, though the courts are very reluctant to disturb them and proceed with greater caution, especially where there has been a second marriage and the rights of innocent persons have intervened.    The fact that one of the divorced parties has, in the meantime, married an innocent third person, will not deprive the court of the power to render justice and vacate the decree; but if there has been unreasonable delay in seeking its vacation, that is sufficient to bar relief however fraudulent the decree was.    1 Black on Judgments, Sec. 320; 2 Bishop, Mar., Div. & Sep., Sec. 1533–35; 2 Nelson, Div. & Sep., Secs. 1050, 1053, 1056; 2 Freeman on Jdgs., p. 860, Sec. 489; Caswell v. Caswell, 120 Ill. 377–84; Adams v. Adams, 51 N. H. 388–96; Nicholson v. Nicholson, 113 Ind. 131–4, and cases cited.

In the section of Freeman cited, *supra*, the author says:

" Decrees of divorce may, when obtained by fraud, be vacated in the same manner and under the same circumstances which would warrant the vacation of any other decree, although the party who obtained the fraudulent judgment has contracted another marriage."

Mr. Black in the section cited, *supra*, says :

" Aside from legislation, the courts will generally hear motions to vacate divorce judgments on the same grounds and conditions as any other judgments, except, perhaps, that they proceed with greater caution, and with more anxious care of the intervening rights of strangers."

Nelson, in Sec. 1050, *supra*, says :

" A judgment which affects but two parties may be set aside without serious consequences to any one but the plaintiff; but if a decree of divorce is vacated, innocent parties may be wronged, and the marriage relation, as a public institution, will be disturbed.    *    *    *    Public policy requires that, as a general rule, the courts may protect themselves by vacating decrees obtained by fraud, although the rights of innocent parties may sometimes be sacrificed.    *    *    *    It is, however, a power which must be exercised with great discretion, and only upon thorough investigation of the facts."

In the Caswell case, *supra*, the Supreme Court affirmed

a decree vacating a decree of divorce obtained by fraud, although fourteen years had elapsed after its entry before proceedings to annul it were commenced, and long after a second marriage had intervened and children been born thereof. Although a court of equity has ample power in this regard, it is said by Mr. Bishop, in Sec. 1533, *supra*, in speaking of the stability that divorce decrees should have:

"The matrimonial status of the parties draws with and after it so many collateral rights and interests of third persons, that uncertainty and fluctuation in it would be greatly detrimental to the public. And particularly to an innocent person who has contracted a marriage on faith of the decree of the court, the calamity of having it reversed and the marriage made void is past estimation. These considerations have great weight with the courts."

In section 1534 the same author says:

"There has always been a manifest reluctance to disturb a final judgment of divorce, especially after a second marriage involving the interests of third persons."

In section 1535, it is also said:

"The court will, to the extent of its power, protect innocent third persons from injury by the reversal."

In section 1553, this author says:

"Delay in the application, by one having notice of the fraud, will, unless satisfactorily explained, operate to the prejudice of the applicant, and if unreasonably continued, it will bar his right."

Mr. Nelson, in section 1050, *supra*, in speaking of cases of a second marriage to an innocent party, says:

"In no case should the court grant relief when the applicant has accepted the benefits of the decree in any way, by receiving alimony or by treating the decree as valid, and marrying another. The rule that unreasonable delay will bar the vacation of a decree for fraud, should be rigidly enforced. The application to vacate a decree will be denied where the applicant is guilty of any conduct creating an estoppel."

In section 1053, *supra*, the same author says, in speaking of the rules which control the court where the rights of innocent third persons have intervened:

"The State is interested in the preservation of a marriage, after a lapse of time, in the security of titles and property rights, and in the legitimacy of children, and where the defrauded party has delayed in asserting his rights for an unreasonable time, the decree should not be disturbed. If the defrauded party could have prevented the second marriage, the application comes too late. Every principle of estoppel and laches should be applied to defeat the party complaining of fraud where a second marriage has taken place.   *   *   *   As against the rights of the second wife, the rule of equity that where one of two innocent parties must suffer from fraud, the party who placed it in the power of the third party to commit the fraud must suffer, should be applied."

Mr. Nelson further says, in section 1056, *supra:*

"It is a familiar principle of law that the party who seeks relief from fraud must proceed promptly upon the discovery of the fraud, and an unexplained acquiescence or delay after he has knowledge of the facts will deprive him of his rights. This rule is especially applicable to a party seeking to vacate a decree of divorce on the ground of fraud; for an innocent person, relying upon the decree, may marry the divorced party, and to vacate the decree will deprive the second wife and her children of property rights and legal status. The defrauded party, after discovering the fraud, can not wait until a second marriage takes place and assert her rights, to the injury of others. If a second marriage takes place after an unreasonable delay of the defrauded party, she has lost her rights by laches and can not disturb the decree upon which others had relied. Public policy forbids the review of decrees of divorce under such circumstances.   *   *   *   Every case must be governed by its own circumstances. The court is not governed by the statute (of limitations) in all cases, but may apply the inherent principles peculiar to courts of equity, and refuse all relief for a delay of a shorter period than is permitted by the statute.   *   *   *   What will explain and excuse delay can not be stated in advance by any rule of law, but is to be determined by the circumstances of each case. *   *   *   Where a party obtains a decree by fraud, it is clear that if the defrauded party relies upon the decree, or in any way accepts its benefits, he is estopped from asserting its invalidity."

The foregoing quoted statements of the text writers are,

in principle, sustained by the decided cases, which we deem it unnecessary to review, inasmuch as each case must be determined by its own peculiar facts and circumstances. Among others, we note the following: Caswell v. Caswell, 120 Ill. 377–84, and cases cited; Wood v. Calland, 86 Ill. App. 42–7; Edson v. Edson, 108 Mass. 590–6; Adams v. Adams, 51 N. H. 388–96; Nicholson v. Nicholson, 113 Ind. 131–5; True v. True, 6 Minn. 458; Everett v. Everett, 60 Wis. 200–4; Daniels v. Benedict, 50 Fed. Rep. 347–52; Hubbard v. Hubbard, 19 Colo. 13; Wisdom v. Wisdom, 24 Neb. 551–5; Bomsta v. Johnson, 38 Minn. 230; Olmstead v. Olmstead, 41 Minn. 297; Yorston v. Yorston, 32 N. J. Eq. 495–502; Redding v. Redding, 15 N. Y. Sup. 600; Marvin v. Foster, 63 N. W. Rep. (Minn.) 484; R. R. Co. v. Holbrook, 92 Ill. 297–300; Seale v. McLaughlin, 28 Calif. 668–72; Newman v. Kiser, 128 Ind. 258.

Many of these cases are cited and relied upon by the appellant's counsel, while the others, though not all, are cited and relied upon by appellees' counsel. None of them present facts or circumstances closely similar to the case at bar. Several of the cases do not involve the vacation of the decrees for divorce, but relate rather to the doctrine of laches as applied by courts of equity, and the binding effect upon a party to a decree of his being represented in the case by an attorney, having knowledge thereof, and failing to repudiate the attorney's acts promptly. Some of the cases also relate to the binding effect of a party's having accepted the benefits of a decree knowing its fraudulent nature.

The case most nearly in point, and the one on which especial reliance is placed by appellant's learned counsel, is the Caswell case, *supra*, in which, as we have seen, the court granted relief as against a fraudulent decree of divorce after a lapse of fourteen years. That case, however, is clearly distinguishable from the case at bar. The defense of laches was there interposed, but did not prevail, because the injured party filed her bill within seven months and seven days after she obtained knowledge of the fraudulent decree, and that delay was excused by the court because

" she was a poor person, of delicate constitution, sick much of the time, dependent on her own labor, with some assistance from her father, for the support of herself and child, and had expended considerable in search of the appellant." The second marriage and birth of children under it had taken place long before the injured party discovered that the fraudulent decree had been entered. She had no opportunity to defend the suit. Also at the time she discovered the decree had been entered, she was in the State of Tennessee, returned to her home in Brooklyn, New York, and then came to Illinois in order to file her bill. As to laches the case presents a very different situation from the one at bar, as will be seen later.

In the Holbrook case, *supra*, the Supreme Court say :

" Where a party has been served with process and neglects to appear and defend, but suffers judgment to be rendered by default, it has long been settled that a court of equity will not relieve the negligent from such a judgment." And further say (quoting Owens v. Ranstead, 22 Ill. 162):

" It must appear to the court that the party complaining has been guilty of no laches on his part; that he has been deprived of the opportunity of asserting his rights or making his defense through some accident, fraud or mistake not of his own procurement, and to which he was not a willing party; for a party has no claim to come into a court of equity to ask to be saved from his own culpable misconduct."

The court also, after quotations from other of its previous decisions, say :

" The doctrine has been uniformly held, that where a party has been served with process and neglects to make his defense, he can not invoke the aid of a court of equity to grant him relief."

In the Redding case, *supra*, where it was sought to set aside a divorce claimed to have been obtained by fraud, and where it appeared that the parties lived and cohabited together after the decree had been obtained and the husband told the wife that the service had been obtained in the case against his orders, that they were of no impor-

tance, and he would proceed no further in the case, it was held that the application should be denied, it appearing from the wife's letters that she knew of the decree immediately on its being made.

In the light of the foregoing authorities, we will now consider the substance of the facts in this record, in so far as they bear upon the questions of estoppel and laches. Appellant knew that Mark H. Maher, her then husband, before the bill for divorce was filed, was going to apply for a divorce, and of the grounds he would allege. She preferred to have him make the charge of cruelty, rather than that of a more serious one which reflected upon her character and of which she insisted she was innocent. She signed the paper authorizing Mr. Riddle to appear for her in the case, and consent to her default. She signed this consent in Riddle's office, away from the presence of her husband, and left it with him, Riddle, without informing him that she had a defense, though she says that she told Riddle that she did not want a divorce. Thereafter it does not appear that she made any attempt whatever to defend the case or notify Judge Brentano, who first heard the evidence and declined to enter a decree upon it, but permitted Maher's counsel to present the case to another chancellor, Judge Payne, without making known to either of said judges the fraudulent nature of the proceeding, or that she was coerced in any way by her husband into signing the appearance and into refraining from making a defense.

Judge Brentano was called as a witness for appellant and testified, among other things, of an interview between him and her at his residence, after the hearing before him and presumably before the case was reheard by Judge Payne. He says that appellant asked him if he had entered or would enter a decree of divorce in that case, and he told her that he would not, that the evidence was insufficient. He further says that she seemed very much pleased that no decree would be entered and felt satisfied.

The preponderance of the evidence is that appellant

knew of the hearing before Judge Payne and of the subsequent entry of the decree by him about the time of its entry, and in any event she knew of it on the 1st day of March, 1895, when she was handed a certified copy of the decree and went with Mark H. Maher and his solicitor, Bisbee, to the bank, where she received $1,500 from the bank.  In the receipt taken at the time and signed by her, she says it is in full for any alimony which may be due her from Mark H. Maher.  Before signing this receipt she stated to the trust officer of the bank, Mr. Henkel, in substance, that she fully understood the effect of signing the receipt and the acceptance of the money.  Henkel, on cross-examination, it is true, said he was not sure but that appellant cried at the time, and that there was "some measure of emotion awakened" in her at the time; that the transaction was in the presence of Maher and Bisbee, his attorney, but that he did not notice anything apparently indicating coercion.

Soon after she received this money, appellant, by an arrangement with Maher, went into the country and remained during five days of the week at the town of Wheaton, Du Page county, where she attended Wheaton College to study French and music, and the remaining two days of the week she stopped at Downer's Grove, Du Page county, with Mr. and Mrs. Daniels, who resided at the latter place, and who were and had been for several years intimate friends of appellant and Mark H. Maher.  It appears that Maher had paid all appellant's expenses at Wheaton and at Downer's Grove, and as a rule occupied the same room with appellant as man and wife from early in the month of March, 1895, until after the middle of the following December.  Also it appears that before Maher and appellant went to the Daniels home, Maher asked Mr. Daniels to permit him and appellant to come to his house, but Daniels replied, "No; you are divorced;" and Maher said in response, in substance, that he was not divorced, and further, replying to inquiries by Daniels, the details of which are shown by the evidence, made statements to the

effect, in substance, that there had been no divorce and
that it was a fraud.   After this explanation appellant and
Maher were allowed to come to the Daniels residence and
there to remain as above stated, as man and wife.   While
Maher and appellant were at the Daniels home it appears
that they were upon the best of terms, that there was
no friction whatever between them, that they were kind,
loving and affectionate one to the other, and that during
this time there were frequent allusions made to the divorce,
on which occasions Maher laughed and joked about it, and
declared that it was a fraud, that money would do any-
thing.   Even the details of the evidence on which the
divorce was obtained were discussed between Daniels and
Maher, in the presence of Mrs. Daniels and sometimes in
the presence of appellant.   Daniels says that he twitted
Maher about the evidence in the divorce case on a great
many occasions, and Maher said:   "Of course I had to say
something to get the divorce; that is about the only thing
we could say and make it go " (referring apparently to a
charge in the bill that appellant had hit him with a flax-
seed poultice on one occasion, and on another with a dish
of peas).

During all the relations of appellant and Mark H. Maher
from March 1, 1895, up to the time of his marriage to Eliza-
beth Bodle on December 21st of the same year, there is
nothing whatever in the evidence to show but that the most
cordial, friendly and affectionate relations existed between
them.   Appellant was constantly, during all this time,
associated with Mr. and Mrs. Daniels, her long time friends,
who were intelligent and well informed people.   Mr. Dan-
iels is a man apparently of wide experience in business
affairs, was the manager of large business interests not
only in Chicago, but in New York and Boston, had studied
law, though he says he was "not guilty of having been
admitted to the bar."   Mr. and Mrs. Daniels both testify
that Maher repeatedly denied that he had been divorced
from appellant, but Mr. Daniels admits, on his cross examina-
tion, when the divorce was being discussed that Maher once

in a while " would laugh and say that whenever it came to an issue he might fix it all up by remarrying.  *  *  *  He said that if there was any doubt about it in any way, shape, manner or form, he would marry her again." From all the evidence of Mr. and Mrs. Daniels, and the allegations in the original bill, we think it is not improper to conclude that they knew that Maher had procured a divorce from appellant, but that he had impressed them by his repeated conversations in regard to it, that it was fraudulent.

From the original bill of appellant to set aside the decree of divorce, which was signed and sworn to by her before a notary public on January 10, 1896, it is perfectly apparent that she not only knew of the filing of the bill for divorce at the time it was filed, but knew of the whole progress of the case before Judges Brentano and Payne, and of the entry of the decree at the time it was entered, or within a day or two thereafter. She says in this bill that a copy of the decree was handed to her, that she asked Maher what it meant, and he told her that it was a decree of divorce which he had obtained from her, but that she " need not fear, as the whole thing amounted to nothing and was a fraud." She, however, says that she protested against such action, and told Maher she could not understand what he was trying to do; that Maher insisted, in the presence of their mutual friends, that they were just the same as ever, and they continued to cohabit the same as ever, but that she " protested that she did not believe that it was right, and demanded that said divorce proceedings ought to be vacated, or, for her protection, that they should be remarried;" whereupon he stated to her and her friends " that they would again have a marriage ceremony performed on or about January 1, 1896; that he did not want to start up the court proceedings any further or have any more newspaper notoriety in connection therewith; " that he insisted that she should " proceed to have new clothes made and prepare for such ceremony, which she consented to do."

If the Daniels did not know of the divorce, why so much discussion of it, and why so many denials of it by Maher?

Why the talk about his marrying appellant again? Why appellant's protest that it should be vacated, and why his promise to marry her again, as in her original bill she alleged and verified by her oath?

The only excuse made by appellant for not acting and making a defense to the suit for divorce, is because of the influence, threats and coercion exerted over her by Mark H. Maher. The same claim is made as to the receipt of the $1,500 by her after the divorce was granted, and as to her failure to act thereafter up to the 22d day of December, 1895, and in addition, that she relied upon his repeated assurances that they were the same as ever and that the divorce decree was a fraud and amounted to nothing.

Were the question one between appellant and Maher alone, and no rights of an innocent third party had intervened, we would have no hesitancy in holding that, under all the circumstances shown in this record, appellant might be entitled to relief, notwithstanding her failure to make a defense to the divorce suit and her delay in filing her bill.

It appears from the evidence that the appellee, Elizabeth Bodle, was introduced to Mark H. Maher in August, 1895, by his own brother and the latter's wife; that from that time Maher made occasional visits to Miss Bodle until some time in September following; that he called upon her thereafter very frequently, and they were quite often together, almost daily, with the exception of two weeks in October, up to their marriage, which occurred December 21, 1895. They became engaged to be married about September 19th. The mother of Miss Bodle learned that Mark H. Maher had obtained a divorce from appellant, and spoke to him about it after her daughter was engaged to him, and he assured her that the divorce was absolute—told her, " I have the papers and the alimony signed by her own hand in my strong box, and you are at liberty to look at the papers if you wish to." We think it safe to assume that this information was made known by her mother to Elizabeth Bodle, though she did not testify, and there is no direct evidence that she knew of the divorce. Had the information that

Maher gave to her mother been followed up, or had she caused the records to be searched, the result would have been to show her an absolute divorce in favor of Maher from the appellant. There is no claim, nor is there any evidence whatever in the record, that Elizabeth Bodle ever had any information that there was any fraud in the divorce, and we think she should be considered as an innocent party, without any blame for her unfortunate situation.

In view of the foregoing facts, and in the light of the authorities cited, we are of opinion that the conclusion of the learned chancellor that appellant is barred by her laches from any relief in this case, is correct. It is unnecessary to pass upon the question of estoppel, though there are reasons why appellant may be said to be estopped because of her failure to make known to the court the fact that she was being defrauded and that she had a good defense to the divorce suit; also because she took from Maher the sum of $1,500, which, although not strictly alimony under the decree, was a benefit to her which she took apparently as the price of her failure to defend, and her silence during the progress of the cause and subsequently, Elizabeth Bodle having in the meantime acted upon the belief that Maher was a divorced man.

As we have seen, while courts of equity have the power to vacate a fraudulent divorce, though in so doing the rights of innocent third parties will be sacrificed, they will proceed with great caution, especially where there has been a second marriage on the faith of the fraudulent decree, and it is the duty of the court, to the extent of its power, to protect such an innocent person. Delay alone, unless satisfactorily explained, if unreasonably continued, will bar the right of a defrauded party. As Mr. Nelson says, in such cases "the rule that unreasonable delay will bar the vacation of a decree for fraud should be rigidly enforced." Also the same author says, "If the defrauded party could have prevented the second marriage, the application comes too late."

We think appellant has not satisfactorily explained her

delay in this case. At Wheaton and at Downer's Grove she was associated for nearly ten months with long time and well informed friends, who could advise her; at least five days in each week was free from any domination or control of Mark H. Maher, and during all this time she knew of the fraudulent divorce, and we think her two friends also knew it. That she relied upon Maher's assurance that it was a fraud, that he would have it canceled, and that he would remarry her, does not, in our opinion, excuse her for this long delay, when, in the meantime, the rights of an innocent woman, relying upon the fact that Maher was a divorced man, have intervened. Had she made known to the court the fraud which had been practiced upon her, or had she insisted upon prompt action by Maher in vacating the fraudulent decree, or in remarrying her, she could have prevented his second marriage. Having failed to do any of these things, it is proper that she be denied relief as against the wife of the second marriage.

The case is essentially different from the Caswell case, *supra*, in which the situation after the delay was in no way different from what it was when the injured party first discovered the fraudulent decree had been entered. In that case no act by the injured party could have prevented the second marriage. Here, action by appellant might, and in all human probability would, have prevented the second marriage.

Aside from the question of laches, we think the decree of the chancellor may be sustained upon that most salutary and equitable rule of chancery, that where one of two innocent parties must suffer from fraud, the one who placed it in the power of the defrauding person to commit the fraud must suffer; that is, the equity of the more innocent one must prevail over that of the party through whose fault the fraud became possible. Appellant was at fault, although she was dominated and controlled by her husband, in not declaring to Judge Brentano, when alone with him at his private residence, the fraud which was being perpetrated upon the court with her knowledge and implied consent.

Had she then spoken, there can be no doubt but that the judge would have acted promptly, dismissed the fraudulent bill, and saved all the distress, annoyance and suffering which have subsequently resulted to appellant, as well as to Elizabeth Bodle.

Appellant was at fault in remaining quiet for ten months in the home of her friends, the Daniels, who, no doubt, would have advised, assisted and protected her, in not insisting upon the prompt vacation of the fraudulent decree by Maher, or on his remarrying her without delay. By her failure to act in these respects, she is to be blamed for the distressing results which have come to her and Elizabeth Bodle. The latter is blameless.

That appellant, in entering her appearance, consenting to default, in failing to defend the divorce suit, and in taking the $1,500 from Mark H. Maher by way of benefit under the decree, acted under coercion from him, can not excuse her for remaining quiet and delaying action for ten months thereafter. Nor can she be excused for this delay by her reliance upon the promise of Maher to vacate the decree or to remarry her. She knew him for years to be a gambler and knew that he was base and mean enough, through a most despicable fraud and downright perjury, to impose upon a court of justice, and even by threats of an attack upon her virtue, when he knew she was innocent, to compel her silence while on other false charges he proceeded to procure a divorce from her. She had no reason to trust him for a single day, much less for ten months. That justice is outraged and its temple desecrated by Mark H. Maher, is not enough to move a court of equity to wrong an innocent and blameless woman in order to award relief to another innocent woman, through whose weakness largely the outrage was accomplished. The decree of a court of conscience, which shields the former and leaves the latter to reap the fruits of her own folly, is righteous altogether.

It is needless to say that we deeply sympathize with appellant for the wrongs done to and the frauds practiced

upon her, as shown by this record, but when her rights and equities are contrasted with those of Elizabeth Bodle, they must yield to the superior claims of the latter, because, although appellant must suffer, she herself, and not Elizabeth Bodle, is to blame.

The decree of the Superior Court is affirmed.

MR. PRESIDING JUSTICE ADAMS concurring :

While concurring in the decision in this case, I do so with grave doubt as to whether it will be sustained if appealed to the Supreme Court; and if reversed, the reversal will not be the occasion to me of either surprise or regret.

MR. JUSTICE SEARS dissenting.

The majority of the court are of opinion, and to that extent I heartily concur, that " were the question one between appellant and Maher alone, and no rights of an innocent third party had intervened, we would have no hesitancy in holding that, under all the circumstances shown in this record, appellant might be entitled to relief notwithstanding her failure to make a defense to the divorce suit and her delay in filing her bill."

But I do not concur in the conclusion that because of the misfortune of Elizabeth Bodle, therefore laches should be imputed to appellant to defeat her right to relief, when no laches would otherwise be imputed.    The chancellor, who heard the witnesses, and this court, agree that a gross and flagrant fraud was practiced by Maher in the procuring of the decree of divorce and in preventing appellant from defending and defeating the suit.    The decree was procured upon a false charge and by perjured testimony.    To permit it to remain upon the record of a court as a valid decree, seems to me to be dangerously near to a reproach upon the administration of justice.    The ground, and the only ground, which is considered by the court as sufficient to warrant the sustaining of this fraudulent decree and the denial of relief to appellant, is that appellant delayed too long her attack upon the decree, and that in the meantime Maher had again married.    The fact that Maher, through whose fraud

the decree was obtained and through whose dominion over appellant a defense to the false charge was prevented, has involved appellee in the consequences of his wrong, should not be permitted to aid this imposition upon the court and make it succeed. Nor should that fact be given undue weight in determining if appellant is guilty of laches.

If, without considering the subsequent marriage of Maher to appellee, the court would, without hesitation, find that appellant was excusable for her delay, then the conclusion should not be changed by a consideration of the unfortunate position of appellee. The determination ought to be controlled by the rights of appellant and the necessity of preserving the integrity of judicial procedure, not by sympathy with the misfortunes of appellee. Otherwise, it would always be an easy method of forever securing the success of such a fraud and imposition upon a court, for the one procuring it and fearing its detection, to simply involve another by a marriage. If appellant has been guilty of no unexplained and inexcusable delay, then the mere fact of the marriage to appellee should not control. Caswell v. Caswell, 120 Ill. 377, wherein the Supreme Court said:

"The facts of appellant's remarriage, of there being children thereof—although we do not see in the record proof of such children—and of the hardship which will result to innocent persons from setting aside the decree of divorce, are dwelt upon as objections to the granting of such relief. Such ill consequences we can appreciate, and must regret; but yet they do not form reason sufficient for a denial of the exercise of the court's power to vacate such a decree obtained by fraud, as has often been determined. Crouch v. Crouch, 30 Wis. 667; Rush v. Rush, 46 Ia. 648; Whitcomb v. Whitcomb, Id. 437; Edson v. Edson, *supra;* Bishop on Marr. and Div., Secs. 751, 753a; True v. True, 6 Minn. 458; Comstock v. Adams, 23 Kan. 513; Adams v. Adams, 51 N. H. 388."

Other decisions in which it has been held that a subsequent marriage should not be allowed to operate as an affirmance of a decree of divorce fraudulently procured, may be found in Whitcomb v. Whitcomb, 46 Ia. 437; State v. Whitcomb, 52 Ia. 85; Adams v. Adams, 51 N. H. 388;

Crouch v. Crouch, 30 Wis. 667; Everett v. Everett, 60 Wis. 200; True v. True, 6 Minn. 458; Bomsta v. Johnson, 38 Minn. 230; Edson v. Edson, 108 Mass. 590.

In Whitcomb v. Whitcomb, *supra*, the Iowa court said :

" It is argued that the decree of the court below, vacating the decree of divorce, should be reversed because of the effect upon Rachel Patterson and her child. Courts find many cases of hardship, in which sympathy is invoked for the suffering of the innocent because of the wrongs of others; but it must be remembered in this case that whatever the suffering and disgrace the innocent child may in the future endure, it is not imposed by the law, but by the wrongful acts of the plaintiff. We must declare the law as we find it, regardless of the consequences to individuals. We have no authority to mould it in accordance with our sympathies."

In Crouch v. Crouch, *supra*, the Wisconsin court said :

" It is stated in the brief of her counsel that since the judgment of divorce was rendered, the plaintiff has married another husband, to whom she has borne a child. We sympathize with the parties who have placed themselves in this unfortunate position, and more especially do we regret that we are compelled to make a decision which will render the child of the last ill-advised union illegitimate; but we have no power to breathe life into these void proceedings. Let the consequences be ever so disastrous to individuals, we can only declare the law as we find it. We have no authority to modify it in cases of supposed hardship."

And in the later case of Everett v. Everett, *supra*, the same court said :

" In this case the interests and well being of society as well as the cause of justice require that the fraud and imposition should not be successful. It is of the highest importance that it should be distinctly understood that the use of such means to procure a divorce will meet with no favor from the courts of this State, whenever the fraud can be clearly shown. It may be true that the affirmance of the order of the County Court will involve an innocent third party in distress and disgrace and destroy rights acquired in reliance upon a judgment, but these consequences are unavoidable."

In True v. True, *supra*, the Minnesota court, speaking of the power and duty of a court of chancery to vacate and set aside a decree of divorce fraudulently obtained, said :

Maher v. Title Guarantee & Trust Co.

"I would be very reluctant to concede such incapacity in the courts of equity. It would be robbing them of a large share of the comprehensive and penetrating jurisdiction which they have so beneficially exercised over the affairs of men by detecting and preventing the most artfully designed schemes of fraud and punishing the perpetrators, and by protecting the weak against the aggressions of the powerful; nor do I see anything in the peculiar nature of the decree that should make it in an ordinary case more conclusive than the other judgments and decrees of the courts. We are told that the parties may marry again and that the consequences would be disastrous to the inheritance of estates and the legitimacy of offspring. Yet it is the constant practice of the courts to refuse to recognize as binding the decrees of courts of other States dissolving marriage contracts when they are irregularly granted, letting the consequences of subsequent marriages take care of themselves. See Jackson v. Jackson, 1 Johns. 424; Pawling v. Bird, 13 Johns. 192; Borden v. Fitch, 15 Id. 121, and the numerous cases cited therein."

And in the later case of Bomsta v. Johnson, the same court said:

"Aside from a well justified reluctance to annul decrees in cases where second marriages have been contracted, the tribunals of this country have, with few exceptions, treated final decrees in divorces precisely as final judgments in ordinary civil actions. When fraudulently obtained they have been speedily set aside upon motion, and wholly ignored in criminal prosecution without regard to consequences and the apparent wrong which might be perpetrated upon adults who had married the divorced parties, or upon innocent children, the issue of such marriages."

Of the above noted decisions, those in the Crouch case, the Whitcomb case and the True case have been cited with approval by the Supreme Court of Illinois in the Caswell case, *supra*. Doubtless expressions of text writers and decisions of other jurisdictions may be found which justify the giving of greater consideration to one standing as does appellee, even to the impairing of the rights of the victims of the fraudulent decree. But from the decisions above cited and the approval of them by our own Supreme Court it would seem clear that the rule announced by those cases

and approved in the Caswell case should govern here. And this doctrine has the support of the weight of authority.

It has ever been the rule that the judgment of a court which has been procured through fraud should be vacated and set aside when attacked in the proper manner, and when the fraud is clearly shown. An early announcement of the attitude of the courts in relation to judgments and decrees thus obtained through imposition upon the court, may be found in Fermor's case, 3 Coke, 77.

In Bradstreet v. N. I. Co., 3 Sumn. 600, Story, J., said:

"I know of no case where fraud, if established by competent proofs, is not sufficient to overthrow any judgment or decree, however solemn may be its form and promulgation."

And in Adams v. Adams, 51 N. H. 388, the Supreme Court of New Hampshire said:

"This doctrine in regard to impeaching judgments and decrees for fraud has been applied in numerous cases to decrees in divorce suits and suits for nullity of marriage, and the weight of authority is greatly in favor of such application. Upon principle there is no solid ground for any distinction between decrees in divorce suits and other judgments, or, if there be any, it is to be found in the much greater danger of fraud and imposition in divorce cases as compared with others; thus adding largely to the necessity and importance of preserving the power to correct or vacate decrees that have been obtained by fraud and imposition. Accordingly it is laid down in Bishop on Marriage and Divorce, section 699, that if a tribunal has been imposed upon and in consequence of the fraud a judgment of divorce has been wrongfully rendered, it may vacate this judgment when, upon a summary proceeding, it is made cognizant of the fraud. This is the doctrine of Allen v. McClellan, 12 Pa. St. 328, and of Dunn v. Dunn, 4 Paige, 425."

There is, then, to be considered only the question of laches, as affected by the conduct of appellant, and not controlled by the misfortunes of appellee, and for the purpose only of determining if appellant's delay was, under the circumstances of this case, excusable.

In this behalf it should be of controlling importance that

appellant, in all that she did and in all that she failed to do as well, was under the dominion of Maher, her husband.

And this applies as well to her conduct during the time of her residence in Du Page county subsequent to the decree, as to her conduct in Chicago preceding the decree.

Appellant was precluded from testifying by the death of Maher. But other evidence amply establishes that throughout the whole fraudulent transaction she was under the power and compulsion of her husband. The chancellor so finds. The decree appealed from recites as a finding of fact:

" Yet, in all the different steps in the original divorce proceedings Alzuma L. Maher was an unwilling party, and that she did whatever she did under the influence and threats that had been exerted over her by her husband, said Mark H. Maher, and those surrounding her."

And also the following finding of fact:

" The court further finds from the evidence, that shortly after the entry of said decree for divorce the said Mark H. Maher and Alzuma L. Maher continued to live and cohabit together as husband and wife at Downer's Grove, twenty-five miles from the city of Chicago, for two days in the week for a period of nine months after said decree of divorce was granted."

The evidence establishes without conflict that during the entire period of the residence at Downer's Grove in Du Page county, appellant was continually there, and not in Chicago, and that Maher went to Downer's Grove each week and remained with her for a part of the week. This residence in Du Page county continued up to the time when Maher informed appellant that he was to marry another woman, and thereby, for the first time, informed her that the decree of divorce was not void and ineffective. Within thirty-one days thereafter this suit was begun. During all the period of the residence in Du Page county, appellant had been repeatedly assured that the decree was invalid and inoperative. The finding of the court that appellee " did whatever she did under the influence and threats that had been exerted over her by her husband," has precisely the same support of evidence as to her

conduct and actions after the decree as before it. In each it is the influence of the husband over the wife. If the finding is justified, as the court concludes that it is, as to the husband's influence over appellant before and during the divorce proceedings, so, too, it must, by the same reasoning, be justified as to her conduct and failure to act after the decree, and while living as Maher's wife. And the one statement of Maher, made in boast of his success in his fraudulent scheme, alone and of itself justifies the conclusion that appellant was at all times, when living with him as his wife, absolutely under his dominion. He said to Daniels, speaking of appellant's acquiescence in the divorce proceedings:

"I forced her to do it—that is, I told her she must do it."

And Daniels testified:

"I told him that I didn't understand any such thing as that, and that if he had my wife I didn't think he could force her to do anything of that kind, but he said he did."

If further evidence were necessary to establish the fact of the husband's dominion over appellant in Du Page county, after the decree, as well as in Chicago before the decree, it is found in the following testimony of Mrs. Daniels:

"If she (appellant) wanted to go away and go out anywhere, she would always ask him; he was very exacting with her. During my intimate acquaintance with them and the many times I visited her house, I do not know of any instance where she disobeyed or mistreated him or slighted his interest in any way. * * * He was very exacting and didn't even want her to go to church."

The close relationship between Mrs. Daniels and appellant existed while appellant was residing in Du Page county after the decree.

When the evidence thus discloses, and without contradiction, that appellant was under the dominion of Maher up to the rendering of the decree, and when the chancellor finds such to be the fact, to hold that there is no specific evidence that such dominion continued after appellant and Maher took up their residence in Du Page county, is a

refinement of distinction which it is difficult to appreciate. Maher had removed appellant from Cook county, where her friends were to be found, where lawyers might be employed to examine the records, and still living with her as her husband, still assuring her that she was his lawful wife and that there was no valid decree of divorce, his dominion over her is as apparent from the evidence and as much to be presumed from all the facts after the decree as before it. There was no difference whatever in their relations. They were still to each other and to the people about them, husband and wife. What new element can be found which in any degree lessened or weakened the dominion of the strong-willed husband over the subservient wife? When the testimony of Mrs. Daniels is considered, that, "If she (appellant) wanted to go away or go out anywhere she would always ask him—he was very exacting with her, * * * he didn't even want her to go to church," it is difficult to see just how appellant could be reasonably expected to act in the way of attack upon this decree while the relationship of Maher as her husband continued. If appellant always obeyed him and always asked his permission to go out, and he did not even permit her to go to a church, the reasonable conclusion is that she could not go to Chicago to employ counsel to attack this decree as long as she lived with Maher as his wife.

In 2 Bishop on Law of Married Women, Sec. 478, the author says:

"In the relation of marriage the husband is recognized by the law as in a certain sense holding the wife in subjection. On this principle it is that she is not ordinarily to be adjudged responsible for wrongs, whether civil or criminal, which she commits in his presence, his coercion being presumed."

But it is said appellant herself regarded the decree as effective, and desired and prepared for another marriage to Maher. There is no evidence that this is so save the following testimony of Daniels:

"He (Maher) said it (the divorce) was a fake and a fraud both. He spoke of the fraud often. He told me at that

time that he didn't have any divorce.  *  *  *  He most assuredly impressed on my mind that he was not divorced. I believed him, and therefore told him that he could come. *  *  *  He shouldn't have stayed at my house if I was not positive that he didn't have a divorce.  *  *  *  He denied everything about the divorce, but then once in a while he would laugh and say that whenever it came to an issue he might fix it all up by remarrying. I asked him what was the necessity for that if he had not gotten a divorce, and he replied, 'Well, I haven't got a divorce.', *  *  *  He said that if there was any doubt about it in any way, shape, manner or form, he would marry her again."

There is no evidence that this proposition to remarry was ever conveyed to appellant. Daniels testified "she was not present" when the talk about remarrying occurred. Mrs. Daniels testified as follows:

" I heard him (Maher) laugh and joke about their alleged divorce as a big joke. We asked him if it was true, and he said no, and he thought we were geese to imagine such a thing to be true. He laughed at me for thinking that he had procured a decree or that they had been separated. Whenever the separation was referred to he said 'there was nothing in it; it wasn't true; there was no separation.' I heard him deny it many, many times. I have heard him say that the decree was a fraud and that money would do anything. He said that in the presence of my husband and in the presence of Mrs. Maher (appellant) when we four were in the library of our house.  *  *  *  The divorce was spoken of by him as a joke, and as far as I am concerned I never knew that a real divorce had been granted. When it was discussed it was looked upon as being a joke. As far as I know there was never any gossip about Downer's Grove about there being a divorce between Mr. and Mrs. Maher. He said that there was no divorce, and he denied it many, many times.  *  *  *  When we were talking about the divorce I never heard anything said about their being remarried. I never heard anything to that effect and Mark never said anything about remarrying her that I heard; I didn't know from any source that they were expecting to be remarried, and if she was preparing a trousseau to get married again, I would have known it. I never heard Mark say that rather than to have the trouble and exposure of a divorce case being set

aside that it was better for them to marry over again, nor did I ever hear him say anything of the sort."

Unfortunately, the appellant could not testify. It is also urged that in her original bill of complaint appellant alleges that such a second marriage to Maher was proposed and contemplated. As to the allegations of the original bill appellant testified: .

"The time it was drawn up was directly after Mr. Maher was married and went away, and it was drawn up hurriedly, and I did not look at it. I do not know whether I read it myself or whether it was read to me, but there are a number of statements in this that I have no recollection of and they are mistakes absolutely. They are not true."

And if the allegations stand unexplained, and if it were admitted by appellant that Maher did promise to marry her again, yet in view of the uncontroverted testimony of Daniels that such a marriage was proposed by Maher, in connection with the assurance that it was unnecessary and that the decree was invalid and of no force, and that he merely offered to do it as a superfluous thing to satisfy any misgivings of appellant, the allegation and the fact would be of absolutely no importance. The rule as to what constitutes laches in such a case as this is yielding and determinable by the facts and equities of the particular case. Harris v. McIntyre, 118 Ill. 275.

In that case the Supreme Court of this State said, speaking of the doctrine of laches in equity:

"It is, however, to be observed that mere lapse of time, however great, will not bar a recovery, if an excuse therefor be given which takes hold upon the conscience of the chancellor, and is such as renders it inequitable that the bar should be interposed."

In 2 Nelson on Divorce and Separation, Sec. 1056, the author, in speaking of the application of the doctrine of laches to the setting aside of a decree of divorce, says:

"Every case must be governed by its own circumstances. * * * What will explain and excuse delay can not be stated in advance by any rule of law, but is to be determined by the circumstances of each case."

And the author cites cases in which it had been held that two years' delay may be explained and excused by poverty of the party; that twenty years' delay is not a bar when the fraud has been concealed; and that fourteen years after the decree it might yet be vacated, where the party had knowledge of it only for seven months before acting, and was excused for the delay during the seven months by her poverty.

In Everett v. Everett, *supra*, the defendant in the divorce suit first learned of the decree about two years after the entry, and then delayed attacking it for eighteen months longer, and the Supreme Court of Wisconsin held that inasmuch as she was excused for the delay by poverty, there was no laches to be imputed to her which would defeat relief.

In this case it can not be said that by fault of appellant appellee became involved in the transaction. Appellant first learned that the assurances of her husband that the decree was of no force or effect were false assurances, upon the 22d day of December, 1895, when she received the following letter:

"Chicago, Ill., Dec. 21st, 1895.

Alice: When you receive this I will be a married man, and on my bridal tour. If you will send me the address where you want your things delivered I will attend to it as soon as I get back. 　　　　　　　　　Mark."

It was then too late to prevent the marriage with appellee. Up to the receipt of this letter appellant had lived with Maher as his wife, relying upon his false statement, repeatedly made, that there was no valid decree of divorce.

Nor can it with propriety be said that Elizabeth Bodle was entirely without fault in the matter of vigilance, for had she made ordinary or slight inquiry as to the manner of life and the domestic relations of the man whom she was about to marry, she would have learned that he was living openly with appellant and holding her out to the world as his lawful wife. It does not even appear that appellee Bodle ever inquired as to the existence of a decree of divorce.

Nor should the doctrine of estoppel apply to defeat appellant. The $1,500 received by her was, so far as the evidence discloses, used in defraying such expense of living and dress as Maher would furnish as her husband. Maher surely could claim no estoppel by reason of the receipt of this money, nor should appellee avail of it.

The very taking of the money was, under the findings of the chancellor, and in the undivided opinion of this court, an act done by appellant under the influence and compulsion of the husband.

Measured by the rules announced in the cases noted, what are the facts which here should "take hold upon the conscience of the chancellor?" Never, until December 22, 1895, did appellant know that the decree of divorce, which was fraudulently procured, which Judge Brentano assured her that he would not enter, was in fact a valid decree, binding upon her and permitting her husband to marry another. Within thirty-one days thereafter, she had secured counsel, and he had prepared a bill of complaint and filed it in this cause. No one asserting rights acquired through M. H. Maher, and through this decree of divorce, ought to be heard in a court of conscience to say that in the period when Maher was constantly assuring appellant that no decree was in force, and that he was still her husband and that she was still his wife, a period in which they so lived as to even constitute presumption of a common law marriage, yet in spite of this the appellant ought to have known that her husband was lying to her and to have acted accordingly.

It may be. that as between the two women, each a sufferer through the wrong of Maher, there is slight difference in claim to sympathy. But it is nevertheless an all-important consideration that the interests and claims of one are grounded upon the fraud practiced by Maher upon the court, and the maintenance of those claims involves a support of the fraud and a permitting of it to succeed. It is, in my opinion, of much greater importance to the administration of law and the preservation of the integrity of

judicial procedure, that the fraud be kept from a final success, than is the protection of appellee from injury resulting to her from Maher's wrong.

The language of Mr. Justice Cole of the Supreme Court of Wisconsin, in Everett v. Everett, *supra*, is apt:

" In this case the interests and well-being of society, as well as the cause of justice, requires that the fraud and imposition should not be successful. It is of the highest importance that it should be distinctly understood that the use of such means to procure a divorce will meet with no favor from the courts of this State, whenever the fraud can be clearly shown."

Doubtless it would be matter of regret that appellee Elizabeth Bodle should be a sufferer from the wrongs of Maher; but it may well be regarded as matter of greater regret and of much more serious consequence, that dishonest litigants should be permitted to believe that a decree of divorce procured upon a false charge and by perjured testimony, can be made good by the continued deception of the victim of it, until another marriage can be effected by the party who has thus imposed upon the court.

For the foregoing reasons I dissent.