# Staunton

SARAH E. TAYLOR V. MARY B. TAYLOR, ETC., AND ROLAND E.
BRYANT, ADMINISTRATOR.

September 22, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Gregory, JJ.

The opinion states the case.

*J. Powell Royall,* for the appellant.

*R. O. Crockett* and *James W. Harman,* for the appellees.

CAMPBELL, C. J., delivered the opinion of the court.

On May 5, 1931, Mary B. Taylor, an insane person who sues by George Harper, her next friend, filed her bill of complaint in the circuit court against Sarah E. Taylor, and Roland E. Bryant, administrator of Charles A. Taylor.

The bill alleges that on March 16, 1892, Mary B. Taylor, whose maiden name was Harper, and Charles A. Taylor were married in Tazewell county, Virginia; that they lived together as man and wife until the — day of ————, 1905, when complainant was duly and legally declared insane and committed to the Central State Hospital for the Insane; that complainant was confined in said hospital until September 30, 1910, when she was paroled in the care and custody of her husband, Charles A. Taylor; that after a short period of cohabitation with her husband she was taken by him to the State of West Virginia and placed in the care of her sisters and brothers, under an agreement that he would dispose of his farm in Tazewell county and would live with complainant in West Virginia; that instead of fulfilling his promises, he became infatuated with Sarah E. Johnson (appellant), a divorcee, and continued to reside in Tazewell county; that on January 10, 1914, Charles A. Taylor instituted a suit for divorce against complainant on the ground of desertion; that process was issued, directed to the sheriff of Tazewell county, and returned unexecuted, and that an order of publication was then resorted to; that certain depositions were taken without further notice, and that on May 25, 1914, a final decree was entered in the cause, granting unto Charles A. Taylor a divorce *a vinculo;* that on the 26th day of June, 1914, the said Charles A. Taylor and Sarah E. Johnson were married in Tazewell county; that during all of this period complainant was insane; that Charles A. Taylor died intestate on the 4th day of May, 1927, survived by complainant and five children born of the marriage; that a short time after the death of Charles A. Taylor, on motion of Sarah E. Johnson (alias Sarah E. Taylor), Roland E. Bryant was appointed administrator of the estate of Charles A. Taylor, deceased; that Sarah E. Taylor has instituted a suit against complainant and the children of Charles A. Taylor, claiming dower in the real estate of which Charles A. Taylor died seized and possessed.

The prayer of the bill is that Sarah E. Taylor be enjoined from prosecuting her suit for the assignment of dower; that a decree be entered declaring the purported marriage of Charles A. Taylor and Sarah E. Johnson (alias Sarah E. Taylor), null and void, and that complainant be adjudged the lawful wife of the said Charles A. Taylor and entitled to participate in the distribution of the personal estate, and as such widow of Charles A. Taylor, deceased, to have dower assigned her in the real estate.

There was a demurrer to the bill, which the court overruled, and the cause was heard upon the bill and answer and depositions of witnesses.

By a final decree the court granted the prayer of the bill, and it is from that decree this appeal was allowed.

In a written opinion, the judge of the circuit court, Hon. A. C. Buchanan, has, in our opinion, so ably demonstrated the correctness of the decree entered that we adopt and reproduce his opinion.

"The question presented is whether the judgment of divorce granted in 1914 on constructive service of process while the defendant was insane may now be set aside in a direct proceeding for that purpose.

"An elaborate note on the general subject is found in L. R. A. 1917B, page 409, where the author, after gathering authorities, and stating principles and conclusions through more than a hundred pages, reaches this conclusion (page 512):

" 'Any attempt to formulate a conclusion which should be a safe foundation for forecasting the outcome of a given attack upon a divorce is foredoomed to failure. It is not alone because, as was said in one case, the methods of procedure to vacate and annul judgments after the expiration of the terms at which they were rendered vary greatly in the different jurisdictions (*Tyler* v. *Aspinwall* (1901) 73 Conn. 493, 47 Atl. 755, 54 L. R. A. 758), but it is literally the case, as was said in another, that every suit in equity to annul a decree of divorce must necessarily be determined

by its own peculiar facts and circumstances (*Maher* v. *Title Guarantee & T. Co.* (1900), 95 Ill. App. 365).'

"But the author discerns what seems to him apparently to be a hopeful sign that there is a growing tendency on the part of courts to grant relief from a divorce that has been granted without notice or gained by fraud or perjury.

"It makes no real difference that the defendant was proceeded against by order of publication. The statute (Code, section 5108) provides that a divorce may be procured by that method of notice, and if the statute is followed a divorce so procured is just as valid and binding as if procured on personal service. Nor is the mere fact that the defendant was insane at the time of the granting of the judgment of itself sufficient to cause the judgment to be vacated. If a divorce is fairly procured on order of publication, it would be a dangerous doctrine, with capacity for untold injury, to say that years thereafter, the defendant could have the decree annulled simply by showing that at the time of the judgment he or she was insane, or confined in some penitentiary on a conviction of felony. The plaintiff in such case may have proceeded in the utmost good faith, and relying on a divorce procured in a way given him by the law, may have married again and had children. Equity could not penalize the innocent because of an error for which they were in no wise responsible. A judgment so obtained against an insane person is not void, but voidable only, and whether it may be afterwards vacated is a question to be determined in each case by a sound discretion exercised under the guidance of established legal principles.

"The solution of the question must necessarily lie in determining whether the plaintiff procured his judgment by fraud on the defendant and on the court, and whether the situation thereafter arising will permit, on the weighing of equities, the granting of relief.

"The jurisdiction of equity to make the inquiry and give relief in a proper case cannot be doubted. Thus it is said in the Note, L. R. A. 1917B, page 443:

" 'No well considered case can be found, it has been said, in which the jurisdiction of courts of equity in suits attacking judgments for fraud in procuring them has been denied.' And

" 'When, by a successful fraud practiced upon the court, a decree of divorce has been obtained, the courts, upon its discovery, have the right and owe the duty to the public and the party wronged of setting it aside and pronouncing it a nullity. *Earle* v. *Earle* (1883), 91 Ind. 27.'

"The difficulty in determining what kind of fraud vitiates the judgment is not in ascertaining the rule, but in applying the rule. The rule is thus stated on abundant authority in said note, L. R. A. 1917B, page 446:

" 'A fraud which entitles a party to impeach a judgment must not consist of any false or fraudulent act or testimony the truth of which was, or might have been, in issue in the proceeding before the court which resulted in the judgment that is thus assailed, but it must be one extrinsic of the matter tried in the cause—one practiced upon the court in the procurement of the judgment.' Again

" 'The acts for which a court of equity will, on account of fraud, set aside or annul a judgment or decree between the same parties, rendered by a court of competent jurisdiction, relate to frauds extrinsic or collateral to the matter tried by the first court, and not to a fraud in the matter on which the judgment or decree was rendered.'

"Looking to how some of the courts have applied the rule in specific instances, we find:

"*Newcomb* v. *Newcomb* [13 Bush (Ky.) 544], 26 Am. Rep. 222:

"The parties were married in 1838, lived together in Louisville, Ky., until 1852, when the wife became insane and was taken to an asylum in Massachusetts. 'There was never any inquest of lunacy held, or any judicial finding of that fact, but it clearly appears from the evidence that she is a confirmed lunatic, and that such has been her mental condition since she was placed in the asylum.'

"In 1871 the husband instituted a divorce suit against her and obtained a divorce on constructive service, that is, by publication on the ground that she was a nonresident. Shortly thereafter he married again and had two children. He died in August, 1874. The first wife instituted suit, by her next friend, in 1875, to have dower in his property. The divorce suit was pleaded in bar and the plea was met by the claim that it was void because obtained on constructive service when the wife was not in fact a nonresident. It was thus a collateral attack on the judgment for divorce, and the court held it void. In the course of the opinion it is said:

" 'That an order of warning in certain cases cannot be made so as to render the judgment valid, although all the proceedings on the face of the record appear proper, is now well settled. In the case of *Dean* v. *Nelson*, 10 Wall. [158, 19 L. Ed. 926], Dean had obtained a judgment foreclosing a mortgage executed by Nelson and wife; some stock owned by Nelson and his wife in a gas company was purchased by Dean at the sale made under the judgment; Nelson was proceeded against as a nonresident by an order of publication, and at and before the time he was warned to appear and answer he was within the Confederate lines; had been expelled from the State of Tennessee (where the judgment was rendered) by the military commander, and forbidden by a published order from returning; he had no opportunity of making any defense, and was prevented by the military order from coming within the Federal lines. At the close of the war Nelson and wife instituted an action against Dean to recover the stock. Dean pleaded as a bar the judgment obtained upon the order of publication in the action against Nelson as a nonresident. Nelson's petition was dismissed, and on an appeal to the Supreme Court the judgment was reversed. The court said: "The publication (the warning) was a mere idle form; the defendants could not lawfully see or obey it; as to them the proceedings were wholly void and inoperative." * * * 'This case was

followed by the case of *Lasere* v. *Rochereau,* 17 Wall. 437 [21 L. Ed. 694]. Lasere was expelled by a military order from his home in New Orleans, and while absent the appellee foreclosed a mortgage upon Lasere's property and had it sold. After Lasere's return to New Orleans he instituted an action against the purchaser and others to vacate the judgment, and the court dismissed his petition. On an appeal the Supreme Court said: "It is contrary to every principle of natural justice that any one should be condemned as to person or property without being heard." Quoting from *Dean* v. *Nelson,* "They could not lawfully see or obey the summons; as to them the proceedings were wholly void and inoperative; the case thus condemned is substantially the case before us."

" 'Other cases might be cited sustaining the doctrine that no one can be deprived of his personal or property rights without being first heard. Such a plain principle of natural justice requires no authority to support it. * * *

" 'In the case of *Meyar* v. *Meyar,* 3 Metc. (Ky.) 298, the party divorced married shortly after the judgment was rendered. The wife, who had been proceeded against as a nonresident, afterward appeared in court, filed her answer, and moved for a retrial of the cause. This was prior to the act of 1869, and there was at that time no law denying the defendant in a divorce case the right to apply for a new trial. The same objection was made in that case now urged here, that the party had again married; the judgment was final and conclusive, and no court had the power to disturb it.

" 'This court in that case said: "Neither reason nor policy demands that judgments of divorce should be exempt from the general law applicable to new trials. The law does not favor divorces, and there is special reason for affording to courts having jurisdiction in such cases every possible means of preventing frauds and correcting any error or injustice committed in the judgment that may be complained of. No appeal lies from a judgment of divorce

and unless the wrong done can be righted by the court committing it, the party injured is without redress." '

"*Dunham* v. *Dunham* [162 Ill. 589], 44 N. E. 841 [35 L. R. A. 70]:

"In this case the wife had been sued for divorce in Illinois. She appeared and filed her answer. During the pendency of the suit she went to South Dakota and there obtained a decree for divorce from her husband on constructive service of process. This decree was then pleaded in bar to the Illinois suit, but the Illinois court held that the South Dakota decree was void, because the wife had in that suit perpetrated a fraud on the court in failing to disclose to the court the pendency .of and the proceedings in the Illinois suit. The court said, in part (page 848 [of 44 N. E., 162 Ill. 589]):

" 'It would, however, seem to follow that a high duty as to publicity, candor and fairness would be imposed on the husband or wife seeking divorcement from his or her nonresident spouse, upon mere constructive service, commensurate with the importance of the questions involved, not only to the absent defendant but to the court and public as well. For it is familiar doctrine that the husband and wife are not alone interested in the suit for divorce brought by one against the other, but the public interests are also regarded as involved, and to such extent that in some jurisdictions the State is represented by counsel; but generally the court itself is alone relied on to protect the public interests in such cases. * * *

" 'But the circuit court of South Dakota was not afforded any opportunity for the exercise of this discretion. By the concealment of appellant, that court had no knowledge that the very questions it was called upon to try in an *ex parte* proceeding were then at issue and pending in a prior suit in the State where both parties had been domiciled, and where both had appeared. More than this, it was denied the knowledge that the very facts upon which its jurisdiction depended were then at issue in such prior suit.

While the question is one not free from difficulty, we are of the opinion that the appellant failed to act in good faith to the court in which her suit was brought in South Dakota; that she was guilty of fraud upon the court and upon the public in obtaining her decree; and that it is, therefore, void. * * *'

"*Southern Nat. Life Ins. Co.* v. *Ford* [151 Ky. 476], 152 S. W. 243:

"There seems to be a statute in Kentucky giving the trial court power to vacate or modify a judgment, after the expiration of the term, among other things, 'For erroneous proceedings against a person under disability, except coverture, if condition of such defendant do not appear in the record;' and in a proceeding under this statute the court said:

" 'It appears from the undisputed evidence that from early in the month of August, 1910, until his death, Elliott Ford was of unsound mind and physically unable to be in court, but there was nothing in the record of the proceedings in the circuit court to disclose this condition to that court when the judgment of October 1, 1910, was rendered. It would be monstrous to say that a man whose mental and physical condition was such as to prevent him from appearing and making defense should be bound by the terms of a plainly unjust and unconscionable judgment against him. The case of *Bean, etc.* v. *Haffendorfer Bros.*, 84 Ky. 685, 2 S. W. 556, 3 S. W. 138, 8 Ky. Law Rep. 739, was one in which an action was instituted against a man of unsound mind, who had never been adjudged to be such, on certain street improvement warrants in the city of Louisville. The process was regularly served upon him, and in his condition he paid no attention to it and judgment went by default, and the sale of his real estate was ordered and had, and the appellees in that case became the purchasers. More than nine years after the institution of the action, and after the death of the lunatic, his heirs at law brought a suit to vacate the judgment against him, and to set aside the sale

upon the ground that he was insane at the time the summons was served upon him, and continued to be up to the time of his death and that none of his heirs knew of the ownership of the lots until after his death and a few days before the institution of the action. In discussing the same provisions of the Code the court in that case said: "There is enough before us in this case to show that the mental condition of Isaac Smith does not appear in the record of the action of Thomasson & Hider against him; but unless the failure of the court to appoint some one to defend for him in that action be an error in the meaning of subsection 5, there was none up to the rendition of the judgment, for there is nothing before us to satisfactorily show that the claim of the plaintiffs in that action was unjust, or that a successful defense could have been made to it, but unavoidable casualty and misfortune preventing the appearance and defense have always been held by courts of equity sufficient grounds for not merely setting aside sales of property under judgment when great wrong has been done, but for setting aside the judgment and permitting the defendant to answer when he has a good defense and makes the application in proper time." ' The judgment was thereupon vacated.

*"Bradford* v. *Abend* [89 Ill. 78], 31 Am. Rep. 67:

"The wife, having become insane, was placed by friends in a hospital in St. Louis. While she was in the asylum a bill was filed in her name for divorce in Illinois against her husband on the ground of desertion, to which the husband appeared and answered. It does not clearly appear who was responsible for the institution of the suit, but the inference is that it was caused by the husband, and the court said:

" 'Without commenting on that branch of the case, as it appears all persons alleged to have been most active in the matter have since deceased, the decision may be placed on the single ground, the wife was insane when the bill was filed and incapable, by reason of her affliction, to give any

consent to the filing of the bill, and that this fact was well known to the defendant. * * *

" 'Our conclusion is the relief granted by the court below is warranted both by the law and the evidence. * * *'

"*Leach* v. *Marsh* [47 Me. 548], 74 Am. Dec. 503:

"The court said this of the duty of the plaintiff to make known to the court the mental condition of the insane defendant:

" 'In *King* v. *Robinson*, 33 Me. 123 (54 Am. Dec. 614), the late Chief Justice Shepley says: "The law does not appear to have imposed it as a duty to be performed by a plaintiff to ascertain the mental capacity of the defendant, and to bring it before the court for its consideration, that such a guardian (*ad litem*) may be appointed." But with all due respect it seems to us that reason and justice and safety do impose such a duty upon the plaintiff in a case like the present. In *Blanchard* v. *Wild*, 1 Mass. 342, Sedgewick, J., says: "Although the court cannot know the fact (of absence from the State) otherwise than by suggestion entered on the record, yet if the plaintiff will take judgment he does it at his peril. It was his duty to make the suggestion, and in practice it was always made, if made at all, under the former statute, by the plaintiff; for who else could make it? Not the defendant, surely; for he is supposed to be wholly ignorant of the existence of the suit." * * * If the plaintiff will take judgment against a man hopelessly insane, without a suggestion of the insanity to the court, or notice to guardian or next friend, must he not do it at his peril? Can he thus carve for himself without regard to the rights of others?'

"As is to be expected, different courts have not always reached the same conclusion on similar or nearly similar facts. The facts in the case of *McElrath* v. *McElrath* [120 Minn. 380], 139 N. W. 708 [44 L. R. A. (N. S.) 505], are very much the same as the facts in the present case, but there the court held that a delay of fourteen years, during which the plaintiff in the original divorce suit had died,

was too long a delay to permit the divorce decree to be set aside. The defendant there was served with a copy of the summons and complaint. She lived within a mile of the plaintiff's home. One thing that makes that case a little different from this is that the defendant appears to have had lucid intervals. The alleged fraud on the court consisted in presenting a false case, *i. e.*, desertion which did not in fact exist, but the court held that she was estopped by her laches, and on this point seems to have charged her with the same duty as if she had been sane, stating in part:

" 'We have found no case holding that a spouse with knowledge that the other, through fraud or perjury not going to the jurisdiction of the court, has obtained a decree of divorce, may sit idly by for years until the death of the one guilty of fraud, and then successfully invoke the equity powers of the court to secure property rights. When the spouse wronged by the decree, or any one claiming under such an one, comes into court asking relief, so that property may be reached it must be done within a reasonable time after knowledge of the fraud or of facts from which a person of ordinary prudence would proceed to ascertain the true state of affairs.'

"And then after reciting that the defendant was personally summoned, knew the ground of divorce was false and that a decree could not be obtained except by concealment and perjury, made no effort to have the decree vacated for more than nine years after she knew about it; that during all this time she lived in the immediate vicinity of her husband, and neither she nor her parents evinced any disposition to object to the decree, the court said:

" 'Her state of mind, unfortunate as it is as shown by the findings, cannot excuse this long delay.'

"What constitutes laches is thus stated in *Dry* v. *Rice*, 147 Va. 331, 137 S. E. 473:

" 'In *Nicholson* v. *Nicholson*, 113 Ind. 131, 15 N. E. 223, it is said: "It is, however, a familiar proposition, and one upon which all of the authorities agree, that a party

who seeks the aid of a court, and asks to be relieved from a judgment obtained against him by fraud, must proceed promptly upon the discovery of the fraud. Any unexplained acquiescence, with knowledge of the facts, and without valid excuse, for an unreasonable length of time will defeat an action to obtain relief from a judgment. *Earle* v. *Earle,* 91 Ind. 27. While judgments in divorce cases are as fully within the common law power of the courts in which they are rendered as are other judgments, there are cogent reasons which need not be enlarged upon here, for the application of the rule which requires diligence on the part of those who ask to have such judgments set aside for fraud. Public policy requires that persons who seek the aid of courts in this respect shall not neglect to take care of their own rights." '

"A further discussion of the subject is found in *Hall* v. *Hall* [70 Mont. 460], 226 Pac. 469, a case in which a divorce decree was annulled because of the fraud of the plaintiff.

"The sort of delay that works an estoppel is necessarily a delay in the face of knowledge of the person's rights, or negligence in acquiring such knowledge. But an insane person should not be charged with such knowledge, because knowledge, or more accurately, the power to exercise or profit by knowledge, does not belong to the insane. With them the power of rational action, the reasoning faculties, have been taken away. It seems a harsh doctrine to say that insane persons are estopped, in the same manner as sane people, from asserting rights because they have failed to act with reasonable diligence or prudence. They are not reasonable beings.

"The *Hall Case* also deals with the situation where the moving party in the divorce suit has married again, holding that to be no bar to the power of equity to annul the divorce. It quotes from 9 R. C. L. 452, to this effect:

" 'In applications to set aside divorce decrees it is frequently urged by the party in whose favor the decree was rendered that relief should be denied because of the

fact that he or she has remarried but such arguments are almost invariably held not to present any insuperable obstacle to the vacation of the decree if the petitioner has not been guilty of laches even though children have been born of the second marriage. It has been well said that it is proper and right in the administration of the law to protect innocent third parties who may marry a divorced man or woman, but that it is quite as proper and important to protect the husband and wife and innocent children from fraudulent divorces. *A fortiori* the hasty marriage of the plaintiff after the procurement of a voidable judgment or decree within the time allowed by law for proceedings to vacate or set aside the same does not impose any obstacle to the granting of such relief. This view has been commended as a wise and conservative civic regulation tending to restrain divorced parties from entering into new matrimonial alliances with too much precipitation and at a time when the decree which severed a former marital connection is still open to assault and reversal in the courts of the State where the judgment is entered.'

"In the case at bar the plaintiff concealed from the court that the defendant, from whom he sought a divorce, was insane. He concealed from the court the fact that her absence from the State was by his agreement. If these facts had been shown the court would not have entertained his suit. He procured a divorce in a situation where he was entitled to none under the law, and where it was against public policy for him to have it; and this not because the court erred in deciding the issue presented, but because of matters outside the issues of the case, which the plaintiff knew, and which he, in good faith, should have made to the court. The defendant could not apprise the court of the facts, because she was insane. Her failure to act for so long cannot be held against her because her mental condition prevented an understanding of her rights. She cannot be charged with the negligence or inactivity of her rela-

tives because her rights are personal to her and the laches of third parties cannot be charged to her.

"As a matter of public policy, a divorce procured in bad faith, by a concealment of vital facts from the court, and against one who has not had an opportunity to defend, and who has not delayed, or who has valid reason for delaying, the seeking of redress, should not be allowed to stand, unless in righting the wrong an even greater injury would be done. Here no children are involved, and the contest is between the lawful wife, who has done no wrong, and the second wife, who, even though guiltless of any intentional wrong, was yet not diligent in knowing the facts. She lived in that neighborhood, knew of the insanity of the first wife and was at no real effort to find out the true facts at the time of her marriage. It seems to me that the divorce was procured in circumstances amounting to a fraud on the court and on the rights of the present plaintiff, for which it should be annulled."

*Affirmed.*

EPES, J., concurs in conclusion.