# Richmond

WILMOT THEODORA TARR, JR. v. BESSIE SARAH TARR.

October 8, 1945.

Record No. 2948.

Present, All the Justices.

The opinion states the case.

*Robert C. Lyne* and *Cutchins & Cutchins*, for the appellant.

*James W. Gordon, Jr.*, and *A. Hamilton Bryan*, for the appellee.

HUDGINS, J., delivered the opinion of the court.

Bessie S. Tarr filed her bill in this case against Wilmot T. Tarr, Jr., her husband, alleging that, on July 23, 1942, he had instituted a suit for divorce *a vinculo* against her on the ground of adultery; that she did not appear and contest the divorce suit, although served with process and notice to take depositions, because her husband had condoned and forgiven all of the offenses alleged against her, had cohabited with her during the pendency of the suit and had led her to believe that the suit for divorce would be withdrawn; and that, during the pendency of the suit and as a result of cohabitation with her husband, complainant had conceived and, on June 25, 1943, she had given birth to a child; and praying that the decree of divorce be set aside and vacated.

Respondent filed an answer denying most of the pertinent allegations of the bill but admitting that, during the pendency of the divorce suit, he, on September 5, 1942, had one act of intercourse with Bessie Sarah Tarr, which did not result in her pregnancy, and "avers and charges that the said act was not voluntary on the part of this respondent in that it was brought about by complainant's connivance and trickery at a time when this respondent had not fully recovered from the severe mental shock and stress occasioned by having learned of the plaintiff's misconduct" with another man.

The trial court entered a decree setting aside and vacating the decree of divorce entered on September 12, 1942, and declaring that Bessie S. Tarr was the lawful wife of Wilmot T. Tarr, Jr., and that the child was the legitimate offspring of that union. From that decree this appeal was allowed.

The conceded facts are that the parties were married on March 13, 1936, and that they continued to live together until June, 1942, when the wife left the husband for a

period of three weeks, after which she returned to his home in Richmond, Virginia. Then they lived together until July 18, 1942, when the wife left the husband again and returned to her former home in Hampton, Virginia. Soon after this separation, one Cecil Goode called by the Tarr home and asked for Bessie Tarr. During the conversation with the husband, Cecil Goode informed him that Lynn Butler, who had occupied a room with Goode at a boarding house, had stolen two suits of clothes and other articles from him and that Goode desired to obtain his address from. Mrs. Tarr, who he heard had gone to Newport News with Butler. Goode told the husband that Bessie Tarr, on several occasions prior to that time, had had intercourse with Butler. When Mrs. Tarr returned to Richmond, she gave Butler's address to Goode. Cecil Goode and Mr. and Mrs. Tarr drove to Newport News together. Butler was arrested, brought back to Richmond, convicted of the theft of the property and sentenced to six months in jail. On the same day, July 23, process and notice to take depositions in the divorce case were served upon Mrs. Tarr.

The public policy of the Commonwealth on the subject is expressed in Michie's Code 1942, sec. 5110. The pertinent provisions are: "When the suit is for divorce for adultery, the divorce shall not be granted, if it appear that the parties voluntarily cohabited after the knowledge of the fact of adultery, * * * ."

The gravamen of Mr. Tarr's contention is that one act of intercourse is not voluntary cohabitation within the meaning of section 5110; and that, even if it is, it is a matter of defense in the divorce proceedings, and that, since Mrs. Tarr failed to plead cohabitation or condonation, she is now barred from successfully attacking the decree on that ground in a separate suit.

A similar provision in the West Virginia Code was construed in *DeBerry* v. *DeBerry*, 115 W. Va. 604, 177 S. E. 440, where this was said: "It will thus be observed that voluntary cohabitation of the parties after knowledge of the adultery charged, whether regarded as condonement or

not, is a conclusive defense. The literal or derivative meaning of the word 'cohabit' is to live together while its popular and often legal signification is to copulate. The latter interpretation was, in our opinion, intended by the Legislature. *King* v. *United States*, 17 F. (2d) 61; *Burns* v. *Burns*, 60 Ind. 259; *Knowles* v. *Knowles*, 6 Boyce's (29 Del.) 458, 100 A. 569, 570; *Herrman* v. *Herrman*, 93 Misc. 315, 156 N. Y. S. 688, 690. In the last case, the court, upon consideration of a similar act stated: 'No one would be heard to contend for a moment that a husband in an action for absolute divorce should be entitled to a decree where it appeared that he admitted having sexual intercourse with his wife after his discovery of her adultery, and no one has ever had the hardihood to raise the point in such a case that sexual intercourse does not of itself constitute "cohabitation" under' the statute.

" * * *. An ancient Anonymous Case, reported in 6 Mass. 147, quaintly expresses the rule, when applied to a complaining husband, as follows: 'If therefore a husband, believing his wife's guilt, will afterwards cohabit with her, whether influenced by his compassion or his affections, or induced by her tears, her penitence or her fascinations, he cannot afterwards avail himself of that offense, to obtain a dissolution of the marriage. And he is bound by his remission, although he after repent of his indulgence, from his subsequent reflections, or from the persuasion of his friends, or from the influence of what he may call the public opinion.' "

The general rule is that a single voluntary act of sexual intercourse by the innocent spouse after knowledge of the offense is sufficient to constitute condonation. This rule is applied more stringently against the husband than it is against the wife. *Rogers* v. *Rogers*, 67 N. J. Eq. 534, 58 A. 822; *Byrne* v. *Byrne*, 93 N. J. Eq. 5, 114 A. 754; *Phinizy* v. *Phinizy*, 154 Ga. 199, 114 S. E. 185; *McClure* v. *McClure*, 205 Ark. 1032, 172 S. W. (2d) 243; 27 C. J. S. 615.

"Voluntarily cohabited," as used in the statute, should not be restricted to its literal meaning of having dwelled together under the same roof with more or less permanency.

■ Ordinarily condonation is a matter of affirmative defense which must be specially pleaded and proven. *Martin v. Martin,* 166 Va. 109, 184 S. E. 220; *White* v. *White,* 121 Va. 244, 92 S. E. 811.

■ It would be shocking to the moral sense for a court of equity to grant a divorce to parties who, during the pendency of the suit, litigated by day and copulated by night. If the fact of the single act of intercourse admitted by the husband had been brought to the attention of the trial judge, the decree would have been refused with or without a plea of condonation. It follows that, although the evidence in the suit for divorce supported the charge of adultery, Mrs. Tarr had an absolute defense to the proceedings for divorce. See *Holt* v. *Holt,* 77 F. (2d) 538; *Buck* v. *Buck,* 205 Ark. 918, 171 S. W. (2d) 939.

The vital question to be determined is whether, in obtaining his decree for divorce, Wilmot T. Tarr, Jr., perpetrated a fraud upon the court and upon his wife.

The testimony of the husband in the divorce suit reveals that his attorney informed him that cohabitation with his wife after knowledge of her acts of adultery would prevent him from obtaining a divorce. While the suit for divorce was pending, Mrs. Tarr returned and spent the night at her husband's home in Richmond, Virginia. Mr. Tarr refused to stay in the house with her and spent the same night at a neighbor's home. He stated his reason for so doing was "because after talking with you (his lawyer) I wanted it certain that I had not lived with her after learning of her conduct with Butler." It thus appears that Mr. Tarr was not only charged with constructive knowledge of the applicable rule of law, but that he had actual knowledge of it. This knowledge did not deter him from subsequently having sexual intercourse with his wife, which fact was not revealed to the court prior to the entry of the divorce decree. It was the duty of the complainant to reveal to the court the true relation existing between him and his wife at

the time he asked for the entry of the decree dissolving his marriage.

The numerous visits that the husband made to the wife, the correspondence between the spouses and at least one act of intercourse during the pendency of the divorce suit were sufficient to lead a reasonable woman to believe that the husband would eventually become reconciled to his wife.

These communications between the parties began on July 23, 1942, the day process was served in the divorce suit, and lasted through September 12, the day on which the divorce decree was entered, and thereafter. Mrs. Tarr admitted in her letters that she had "sinned," declared her love for her husband, begged him to forgive her and permit her to return to him as his wife. Mr. Tarr, in his letters, called his wife "Honey," stated in several of them that he loved her, that he had forgiven her and that he was praying for Divine guidance as to whether he should become reconciled to her. At Mr. Tarr's request, notice was given to take the depositions of Mr. Goode on August 8 in Richmond. The following extracts are taken from a letter written by Mr. Tarr to his wife, postmarked August 7, 1942:

"Bessie, I still love you but I have been praying that God would show me just what to do. I prayed that he would bring you back to me the first time and asked him to and he did, I stepped out ahead of him and asked you to come back begged you to come back, you said you had prayed and was coming back, that you didn't realize just what you had wanted and what you were giving up, you came back and I was happy, pleased, but you hadn't come back to God as you should have, * * * . You left me holding the bag to make the best of a broken home and a lost confidence in one whom I love and trusted. You seemed satisfied until you saw what was about to happen and that I was going to do what you wanted about a divorce and filed a complaint for one.

"I saw you Thursday night I wanted you then I wanted you to confess and ask God to forgive you and for me to take you back. * * * .

"I waited a week and when I saw you I thought you would still tell me everything and pray to God openly asking for forgiveness, Honey, I knelt in prayer with you and asked you to pray you would not.

 ✳ ✳ ✳

"I am letting the divorce go as it is and am going thru with it. I know that it means trusting Him (God) with my whole heart now and if you really mean business with God then he will show me just what confidence and trust to place in you. * * * .

"Honey, I don't know just how long the Lord will take to show me that you really mean business He might take six months or even a year and whatever he shows me that is what I intend to do. Honey, I have forgiven you for all that you done that I know about and as God reveals to me those things that you have done in secret then I will still forgive you considering myself also lest I be tempted. I will pray for you nightly.

"I am not going to step out ahead of God this time for you see what happened the last time I shall wait upon the Lord he will show me just what you are and just what you will do."

Mrs. Tarr's two sisters, testified that, on September 5, when Mr. Tarr arrived in Hampton to visit his wife, he said, in their presence, "I still love Bessie and can't make up my mind what to do." Mr. and Mrs. Tarr spent that night together alone in Mrs. Tarr's sister's home. The next morning, September 6, the brother-in-law saw Mr. Tarr, clothed in his pajamas, in a bedroom with his wife.

The following extracts are from a letter to Mr. Tarr from his wife, postmarked September 11, 1942, just a day before the divorce decree was entered:

"Just a few lines to say hello and as I'm still waiting for a letter from you. You told me you would write me the first of the week. * * * .

"Honey have you been thinking about letting me come back? Please do I want to so bad. Bud you'll never realize just how bad I want you and a home and everything you

desired for. I was crazy as I don't know what to ever give up what I had. Honey please let me have it back with you. Don't think this is a plea on account of being pregnant because I'm not. * * * Bud if you consider won't you take me back the first of the month. Ask God to put confidence enough in me to make you trust me. Please honey I'm so lonesome for some one to love. I love you and you know it. Honey don't think I'm crazy to ask you to take me back but I can't help it I want you so bad. I mean every word I say. I'll do anything in the world I possibly can for you if you'll take me back do it the first of October. If I have to wait longer I'll go crazy. I mean if you consider it. Honey please let me know at once. You rent us a place some where and fix the furniture in it and then let me come back. We will need a new gas stove won't we?

 * * *

" * * * . I want to come back. I'm trusting God that you will take me back. I'm putting all confidence in him that why I refused the date Monday night. * * * .

"Pray for me and I'll do the same for you. Good night honey and I love you. Let me come back (soon)."

Mrs. Tarr wrote another pleading letter on September 23, eleven days after the decree was entered, begging her husband to take her back and stating that she was coming to Richmond the Saturday or Sunday following. She testified that on September 27 or 28 she came to Richmond and had intercourse with her husband at Murphy's Hotel. This the husband denies. Mrs. Tarr wrote her husband three letters in October begging him to come to see her, in some of which she expressed the hope that he would become reconciled to her.

These incidents and circumstances clearly reveal that the parties were not dealing at arm's length. They afforded the wife reasonable grounds to believe that it was unnecessary for her to appear and make defense to the suit for divorce. In other words, Mr. Tarr, by his sanctimonious misrepresentations to his wife, led her into a position of false security and concealed from the court the true relations be-

tween him and his wife. Annotations, L. R. A. 1917B, 454; 17 Am. Jur. 384.

Mr. Tarr contends that the decree setting aside, annulling and vacating the decree for divorce is erroneous because Bessie Tarr was guilty of laches in instituting this suit.

Mr. Tarr testified that in September, 1942, a few days after the divorce was granted, he gave Mrs. Tarr a copy of the divorce decree, and that, on March 13, 1943, six months and one day from the date of the final decree for divorce, he married Cornelia Harrell, who, on August 13, 1943, gave birth to a normal child, and that, due to the delay in instituting this suit to vacate the decree for divorce, his rights, as well as the rights of this child and its mother, have been prejudiced.

"The rule which requires a defrauded party to act promptly for the protection of his rights is peculiarly applicable to suits for divorce, lest by delay the relations of the parties be changed, the rights of innocent third persons intervene, and the peace of society be disturbed." Opinion by Judge Burks in *Dry* v. *Rice*, 147 Va. 331, 137 S. E. 473, 475.

Bessie Tarr testified that on November 22, 1942, she notified Mr. Tarr that she was with child by him. Later, this fact was repeated in letters from her to him. She also stated that she was not informed of the fact that the divorce decree has been entered until April 25, 1943—just two months before the birth of her child, and that, as soon as she was physically able thereafter—within three months— she instituted this suit. It thus conclusively appears that, before Mr. Tarr had a legal right to remarry, he was fully informed of the condition of Mrs. Bessie Tarr, but this fact did not deter him from contracting a hasty marriage within six months and one day from the date of the entry of the divorce decree. The birth certificate of the child born to his second wife shows that there were nine months of pregnancy and that the child was born on August 13, 1943, from which it is evident that the child was conceived on or about November 13, 1942. It thus affirmatively appears that Mr.

Tarr cannot be restored to his former status, but the delay in instituting this suit was not the cause of the inability of the court to restore him to that position. The inability so to do is due to the fraud practiced upon the court and upon Mrs. Bessie Tarr and his failure to control his passions in his contacts with his second wife prior to their marriage. Mrs. Bessie Tarr in no way contributed to any of these unlawful acts.

Before Tarr was free to contract a second marriage, he, due to his breach of the moral code, was confronted by the demands of two women, each of whom, to his knowledge, was with child by him. As soon as the legal restrictions were removed, he elected to marry the second woman. This change in his status was occasioned by his own acts and by his own incontinence. It was not caused by the delay in bringing this suit.

 " 'In applications to set aside divorce decrees it is frequently urged by the party in whose favor the decree was rendered that relief should be denied because of the fact that he or she has remarried but such arguments are almost invariably held not to present any insuperable obstacle to the vacation of the decree if the petitioner has not been guilty of laches even though children have been born of the second marriage. It has been well said that it is proper and right in the administration of the law to protect innocent third parties who may marry a divorced man or woman, but that it is quite as proper and important to protect the husband and wife and innocent children from fraudulent divorces. *A fortiori* the hasty marriage of the plaintiff after the procurement of a voidable judgment or decree within the time allowed by law for proceedings to vacate or set aside the same does not impose any obstacle to the granting of such relief. This view has been commended as a wise and conservative civic regulation tending to restrain divorced parties from entering into new matrimonial alliances with too much precipitation and at a time when the decree which severed a former marital connection is still open to assault

and reversal in the courts of the State where the judgment is entered.'" *Taylor* v. *Taylor*, 159 Va. 338, 165 S. E. 414.

Mr. Tarr further contends that his second wife and their child were necessary parties to the suit and that the court committed error in entering a decree to their prejudice when they were not parties to the cause.

No authority is cited to support this contention. If the second Mrs. Tarr and her child had been made parties to the cause, the issues would not have been changed. All available defenses were made and all pertinent evidence was admitted or was admissible. Mrs. Bessie Tarr sought no relief against the second Mrs. Tarr or her child. The marriage between Mrs. Bessie Tarr and Mr. Tarr was valid. It established a status of the highest importance to the social welfare of the Commonwealth. Such a status cannot be dissolved during the joint lives of the parties except for the causes specified by statute. This status cannot be dissolved legally by fraud perpetrated upon the court and upon the legal wife. The guilt of the husband in speedily contracting the second marriage is the sole cause of the misfortunes of the second wife and her child, to which no act of Mrs. Bessie Tarr contributed. See *Vanness* v. *Vanness*, 128 Ark. 543, 194 S. W. 498; *Sampson* v. *Sampson*, 223 Mass. 451, 112 N. E. 84; *Turner* v. *Williams*, 202 Mass. 500, 89 N. E. 110, 132 Am. St. Rep. 511, 24 L. R. A. (N. S.) 1199; *Holmes* v. *Holmes*, 63 Me. 420. Some measure of protection is afforded the second wife and her child by Michie's Code 1942, sec. 5270.

This court has carefully scrutinized the pertinent evidence on the question of cross-appeal, asking for an increase in the amount awarded by the trial court for the support and maintenance of Mrs. Bessie Tarr and child. The trial court is in a better position to determine this question than this court. It has the power to increase or decrease the amount allowed as the circumstances of the parties brought to its attention may justify. Viewing the evidence as a whole, we find no reversible error in the ruling of the trial court on this question.

The additional compensation of $200, requested by the attorneys for Mrs. Bessie Tarr for their appearance and argument in this court, seems reasonable and is allowed. The decree of the trial court will be enlarged to include the additional compensation allowed counsel for appellee, and is in all other respects affirmed. The case is remanded for such further proceedings as may be authorized by law.

*Amended, affirmed and remanded.*