## CIRCUIT COURT OF WARREN COUNTY

Higgs

    v.

Higgs

August 16, 1983

Case No. (Chancery) 4461

By JUDGE HENRY H. WHITING

In this case a husband seeks to obtain a divorce based on a separation a number of years ago as well as the enforcement of a property settlement agreement entered into at that time; the wife contends they have been reconciled.

The issues raised are:

(1) The husband's contention that their contacts during that period do not establish that they had not continued to live "separate and apart without any cohabitation and without interruption for one year" so as to deny him the right to a divorce on that ground.

(2) Whether their activities were sufficient to show such a reconciliation as would abrogate the effect of the agreement they entered into a number of years ago.

*Findings of Fact*

The parties, who were married in 1955, had three children, all now over the age of eighteen. They had previously separated about ten times during the marriage,

those separations for a period of one or two weeks and perhaps as long as a month (69). The separation giving rise to this litigation occurred in November of 1980. Mr. Higgs apparently had lost his job in Marshall, Virginia, taken another job in Maryland and was living there during the week but returning home most weekends. When Mrs. Higgs discovered that Mr. Higgs was having an affair with some woman in Maryland, she became quite angry and they separated (42). Mrs. Higgs' lawyer prepared the separation agreement (Complainant's Exhibit 1), which both parties signed. About three months after the agreement was signed, the husband returned, asked Mrs. Higgs to take him back, she agreed to do so and they resumed their marital relations (43-44). After being in the home with Mrs. Higgs for two days, the husband moved out again without discussing the reason with Mrs. Higgs at the time, but later he told her that ·he left because his paramour was threatening to come to Front Royal and tell Mrs. Higgs about the affair if he did not return to her in Maryland (44). This was not denied by the husband.

Even though the husband apparently went back to his paramour at that time, nevertheless he still continued to see Mrs. Higgs frequently, not only visiting her overnight in the marital home in Front Royal but also in motels in Maryland and at the home of some of their relatives over this period. While Mr. Higgs attempted to minimize the contacts on direct examination (13, 14, 16, 17, 18), cross-examination of Mr. Higgs indicated much more frequent contact and even re-direct examination expanded his admissions of sexual intercourse. *Compare* pages 13-14 with page 26. Mr. Higgs' testimony also showed *another* reconciliation "weekend" slightly over a year after the separation in November of 1980 (27). The evidence of Mrs. Higgs, her mother and their daughter shows even more frequent contact between the parties after November of 1980 and up until the spring of 1983 just before Mr. Higgs filed this suit for divorce based on separation for a period exceeding one year. That evidence convinces the Court that the parties not only met frequently, went to dinner, shopping and to movies (48), spending the night together and engaging in sexual relations (45), but also providing each other those other services also associated with marital cohabitation, the wife preparing meals, washing the hus-

band's clothing on occasions (47), the husband once or twice mowing the lawn of the marital home (70), and exchanging Christmas gifts in 1981 (57, 68).[1] The husband gave the wife a new outfit and attended with her the grand opening of the dress shop at which the daughter was employed in 1982 (57). They also advanced money to each other on an informal basis, the wife lending $700.00 for the payment of the husband's mother's funeral bill (79), $300.00 on another occasion (75), and the husband permitted the wife to receive all of the income tax refund without accounting, after reimbursing herself for the loan on his mother's funeral bill (104). Even when apart, they corresponded by letter (48) and he called her at least once and sometimes twice a week (48).

The wife introduced a number of the husband's letters to her which confirm their many contacts and speak of their plans to live together on a full-time basis in the same house when their marital home in Warren County was sold. While the letters might be construed consistent with the husband's insistence that all contacts were merely "trys" at reconciliation and "no positive commitment" (15) to get back together, when considered with all the other evidence of the husband's conduct those letters only corroborate the wife's contention of a reconciliation and a full resumption of marital relations, if only on a "part-time basis" (50).

Although the husband claims their continued partial separation was not by their agreement so that the wife could look after the marital home in Warren County until it was sold (21-22), the Court finds from the evidence that she remained there at his request for that purpose (51).

The parties virtually ignored the separation agreement during this period, the husband failing to continue the

---

[1] There were no Christmas gifts exchanged in December of 1982, but the wife said this was because neither of them had had jobs during the year and he had told her not to worry about getting him a gift for Christmas and apparently he did not give her one (65).

medical insurance (23)[2] or pay hospitalization bills (*compare* 31 with 57, 86), failed to pay the bill for bottled gas (54), yet he paid bills the wife agreed she would pay in the agreement (22, 23).

The husband claims the wife agreed they would "go by the same agreement" (28) as in the fall of 1981 (27) but never complained of her breaches of the agreement nor did she complain of his. The Court accepts the wife's version that they did not follow the agreement because they had been living together (58).

### Conclusions of Law

(1) *Period of Separation*

As the findings of fact have already indicated, the parties have spent the night on a number of occasions, engaging in sexual intercourse, in other ways dealt with each other as husband and wife and held themselves out as husband and wife to third parties. The husband contends that this case is controlled by *Roberts v. Pace*, 193 Va. 156 (1951). That case is inapposite for several reasons.

(a) The trial court in that case found that the husband did not intend a reconciliation during his wife's life but had several conditions to the reconciliation which the wife had not yet met and also there was no reasonable explanation as to why the parties had not resumed living together on a full-time basis. In this case both parties agreed that the husband would remain in Maryland while he apparently worked and the wife in Virginia until the Virginia home could be sold but that they would meet and live together as husband and wife on weekends and other occasions, resuming the marriage, as the wife said, "on a part-time basis" until the house was sold in Warren County. The evidence also shows that the husband did not want to return to the Warren County area to live and work but requested the wife to remain

---

[2] While the husband pleaded his poverty as an excuse for his failure to continue the hospitalization, he admits his recent purchase of a new sports car for $14,000.00 and that he owes nothing on the purchase price (24).

there to protect their joint property until it could be sold, at which time she would join him.

(b) Although no cases in Virginia are noted except *Hooker v. Hooker*, 215 Va. 415 (1975), the majority of the cases in the annotation dealing with the extent of a separation as grounds for a divorce in 35 A.L.R.3d sect. 12, beginning at page 1281, indicate that in statutes somewhat similar to our no-fault statute, cohabitation is used in the connotation of sexual relations and sporadic cohabitation during any of the required period for separation has been generally held to be a bar. In those few cases which have not denied divorces under those circumstances, the Court used the argument the husband has in this case, that "it is to the best interests of society and the parties concerned that estranged spouses be encouraged to continue their friendly relations and thereby increase the probability of a reconciliation." *Id.*, at 1284. However, that rationale (also urged by the husband in his memorandum dated July 7, 1983, page 4) was expressly rejected by the Virginia Supreme Court in a refusal to merge an *a mensa* decree into a final decree where the husband and wife had cohabited during the period, saying:

> If the law were otherwise, a man could in effect make his wife his mere mistress until the final decree dissolving the marital bonds was entered. To permit such would violate the public policy of the State. Society demands that husbands and wives endeavor in good faith to reconcile their differences and dwell together in unity and peace. *Anderson v. Anderson, infra*, 29.

(c) As *Anderson v. Anderson*, 196 Va. 26, 29 (1954), points out, *Roberts v. Pace* involved a property settlement and "the question there decided was one of property rights, as to which the principles of law are different than those relating to the dissolution of the marital status." In *Anderson*, a weekend visit with three admitted acts of sexual intercourse by the husband defeated a petition for merger of a bed-and-board divorce on the ground that "the husband had failed to show that a reconciliation has not taken place and that the separation has continued without interruption . . ." *Id.*, at 30-31. In this case,

not only has the husband failed to show that a reconciliation had not taken place and that the separation had continued without interruption, the preponderance of the evidence demonstrates to the contrary. While the husband argues for a different construction of the new "no-fault" divorce statute and the old desertion statute and perhaps from the merger statute described in *Roberts v. Pace*, a comparison of the merger statute, § 20-121, and the no-fault divorce statute indicates the legislature may have intended to require a higher standard of separation in the no-fault statute in adding the words "without cohabitation" in the no-fault statute. The merger statute merely requires "separat[ion] without interruption" but the no-fault statute requires "liv[ing] separately and apart without cohabitation and without interruption." The legislature apparently intended to exclude "mere casual cohabitation" if a no-fault divorce is being sought. As Judge Woltz has pointed out in *Reel v. Reel*, Circuit Court of Frederick County, Chancery No. 6377, July 2, 1981:

> The word "cohabitation" has different meanings. It can mean living together, living together as man and wife, or sexual intercourse. Black's Law Dictionary, 3d ed. Its literal meaning and by derivation is simply living together. *Tarr v. Tarr*, 184 Va. 443 (1945). In construing Section 20-94, which makes voluntary cohabitation after knowledge of adultery a bar by way of condonation to a divorce suit on the grounds of adultery, that case found "cohabited" as used in that statute to mean sexual intercourse. Section 20-91(9) establishes the ground for "no fault" divorce when the parties have "lived separate and apart *without any cohabitation*" (emphasis in original) for an uninterrupted period of a year. By distinguishing between living separate and apart and cohabitation, the inference is that the word in that statute means sexual intercourse.

The remaining meaning of cohabitation, namely, living together as man and wife, involves many and varying sets of facts and circumstances. As distinguished from sexual intercourse merely it is that type of association which even an unmarried couple may have though that association may be criminal as a violation of Section 18.2-345, the lewd and lascivious cohabitation statute, 1A M.J., Adultery, Fornication and Lewdness, § 11, or that portion of § 18.2-362, the bigamy statute, involving cohabitation in this State. 10 Am. Jur. 2d, *Bigamy*, § 16.

While no precise delineation can be given to the concept of living together as husband and wife, it includes the idea of services rendered one to the other, mutual society and companionship, aid and comfort, protection and conjugal affection, many of which things are included within the term "consortium." Sexual intercourse is a usual, important, but not necessarily required, element of the concept.

The Court agrees with his construction of cohabitation in the no-fault statute and believes it does exclude "any cohabitation" (casual or not) if those are the grounds for the divorce.

Even if the Court's construction of the no-fault statute is erroneous, it believes that the facts in this case establish that the cohabitation was more than casual but rather was as frequent and regular and as often as the schedule of the parties would permit it in discharge of their mutual conjugal duties.

Therefore the Court denies the husband's prayer for a divorce based on the earlier separation.

(2) *Sufficiency of the Evidence of Reconciliation and its Effect if Established upon the "Agreement"*

*Roberts v. Pace* also affects this issue. In contrast to *Roberts v. Pace*, both parties intended to become reconciled; each of them violated the previously executed agreement without any action taken by the other to cure the breach if the agreement was still in effect. In *Roberts*

both continued to adhere to the agreement throughout the entire period.

Since the Court concludes that the parties did become reconciled during the period and it now must answer the question Justice Smith declined to answer in *Roberts v. Pace, supra*, in which he found no reconciliation and therefore did not have to answer the second question as to the effect of any reconciliation upon the post-nuptial property settlement. The "agreement" in this case in the last "whereas" clause indicates the parties' "desire to settle all financial, proprietary, custody and support matters existing between themselves," and the body of it provides for their mutual separation, certain financial arrangements, as well as custody of the infant child. However, it is interesting to note that there was no express provision made for spousal or child support and, indeed, they are not even mentioned except generally in the last "whereas" clause. The Court construes the agreement as both a property settlement and a separation agreement and, for the purposes of this holding, perhaps as an agreement providing for certain aspects of spousal support in the future.

While ordinarily a reconciliation and resumption of cohabitation does not abrogate a true property settlement, § 913, *Divorce and Separation*, 24 Am. Jur. 2d 1039, this general rule has been applied to those provisions which are executed and not those which are executory, sect. 915, *Divorce and Separation*, 24 Am. Jur. 2d 1042. If the parties owned the marital property as joint tenants, the question of the continued enforcement of the agreement would be moot since they have already agreed to sell the house and apparently have a contract of sale to third parties in existence.

The remaining portions of the property settlement deal with monthly payments on insurance, the house, utilities and the like. To the extent that they have been executed (or breached), the Court does not believe it can or should change the agreement. To the extent that they are executory, the Court must decide whether the parties are to be held to those portions. This problem is especially important in the consideration of spousal support if spousal or child support has been completely covered by the agreement, which the Court is not deciding

at this time in this case. If those provisions are for spousal or child support, they are inherently executory since they provide for payments to be made in the future by way of life insurance premiums, house payments, a portion of the automobile insurance, hospitalization and other insurance, a number of which have shown not to have been adhered to in the main.

In this case the Court need not decide whether the Virginia law is as broad as that stated in § 915, 24 Am. Jur. 2d 1042:

> The features of a separation agreement which are inherently executory, such as a provision for future support and an agreement to live apart, are necessarily abrogated by a reconciliation and resumption of cohabitation. Accordingly, such conduct terminates the husband's contractual duty to make periodic payments for the wife's support, and since the agreement is abrogated by such conduct, the wife may later obtain alimony when suing for a divorce or separation.

This is because the Court finds from the evidence that the parties themselves had treated the agreement essentially as abrogated during the period of their reconciliation. As a number of courts have pointed out, it is generally a question of the intent of the parties at the time of reconciliation and the Court has found not only a mutual intent to reconcile but a mutual ignoring of the property settlement agreement. Where an intent is manifest that the agreement continue, particularly if it is an executed agreement, it does continue even after a reconciliation. *Barnes v. American Fertilizer Co.*, 144 Va. 692 (1925). In that case the wife made it manifest that she would not be reconciled unless a previously executed property settlement continued in effect and the conveyance to her by the husband of certain property was upheld against an attack by the husband's creditors despite their later reconciliation. Despite the husband's newspaper ad in July 1981 that he would not be responsible for any debts but his own and his protestations that all contacts were "no positive commitment," his other actions led the Court to find that he did intend *then* and not later when the

house was sold to be reconciled and to terminate the agreement.

It is therefore the opinion of the Court that the executory provisions of the property settlement agreement have been abrogated and is no longer effective and binding between the parties.